# No. 24-981

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

DIRECTV, LLC,
*Plaintiff-Appellant,*
v.
NEXSTAR MEDIA GROUP, INC., MISSION BROADCASTING, INC., AND
WHITE KNIGHT BROADCASTING, INC.,
*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Southern District of New York

---

**PAGE PROOF BRIEF OF APPELLANT
DIRECTV, LLC**

---

Amanda Shafer Berman
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, DC 20004
(202) 624-2500
aberman@crowell.com

Jordan L. Ludwig
CROWELL & MORING LLP
515 South Flower Street
Los Angeles, CA 90071
(213) 622-4750
jludwig@crowell.com

Olivier N. Antoine
Jared Levine
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 223-4000
oantoine@crowell.com

# CORPORATE DISCLOSURE

Pursuant to Fed. R. App. P. 26.1 and Second Circuit Local Rule 26.1, DIRECTV, LLC ("DIRECTV") states it is a wholly owned subsidiary of DIRECTV Holdings LLC. DIRECTV Holdings LLC is a wholly owned subsidiary of DIRECTV Financing, LLC. DIRECTV Financing, LLC is a wholly owned subsidiary of DIRECTV Financing Holdco, LLC. DIRECTV Financing Holdco, LLC is a wholly owned subsidiary of DIRECTV Entertainment Holdings LLC. DIRECTV Entertainment Holdings LLC is jointly owned by AT&T Inc. (70%) and TPG VIII Merlin Investment Holdings, L.P. (30%).

AT&T Inc. is a publicly traded company on the New York Stock Exchange. There is no one person or group that owns 10% or more of the stock of AT&T Inc. TPG VIII Merlin Investment Holdings, L.P. is a privately held limited partnership

Dated: July 2, 2024                    /s/ Olivier N. Antoine
                                       Olivier N. Antoine

# TABLE OF CONTENTS

CORPORATE DISCLOSURE ....................................................i

INTRODUCTION..................................................................1

JURISDICTIONAL STATEMENT ...........................................4

STATEMENT OF ISSUES....................................................4

STATEMENT OF THE CASE ................................................5

    A.    The parties and their industry. ............................5

    B.    Nexstar's "sidecar" relationship with Mission and White Knight.........................................................7

    C.    The price-fixing conspiracy. ................................8

    D.    The conspirators' motion to dismiss. .................10

    E.    The district court's decision. .............................11

SUMMARY OF ARGUMENT ................................................13

STANDARD OF REVIEW....................................................16

ARGUMENT ...................................................................16

I.    DIRECTV has suffered an antitrust injury—lost profits—that flows from Appellees' price-fixing conspiracy. .................................................................17

    A.    The district court's holding that only a purchaser who pays supracompetitive prices may challenge a price-fixing conspiracy is contrary to precedent holding that lost profits are a form of antitrust injury. .........................................................19

    B.    DIRECTV's injury flows directly from an anticompetitive effect of Appellees' price-fixing conspiracy. .........................................................25

C.  The district court's new requirement for claimants seeking to challenge a price-fixing conspiracy is at odds with the Supreme Court's decision in *Lexmark*. ............................................30

II.  As the target of Appellees' conspiracy, DIRECTV is an efficient enforcer of the antitrust laws. .......................................34

A.  The district court wrongly found DIRECTV's injury to be indirect and speculative because DIRECTV is a "non-purchaser." .........................................35

1.  The district court misapplied a Ninth Circuit case and ignored more relevant case law. .............................................................37

2.  Rather than accepting DIRECTV's allegations, the court wrongly assumed that there are other, more direct victims of Appellees' conspiracy better positioned to enforce the antitrust laws...........................................43

B.  The district court wrongly ignored two factors of the efficient enforcer analysis. ............................................45

1.  As the direct target of the conspiracy, DIRECTV is motivated to enforce the antitrust laws against Appellees. .............................46

2.  There is no risk of duplicative recovery....................46

CONCLUSION ......................................................48

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Needle, Inc. v. Nat'l Football League,*
  560 U.S. 183 (2010) ........................................................... 25

*Andrx Pharmaceuticals, Inc. v. Biovail Corp. International,*
  256 F.3d 799 (D.C. Cir. 2001) ........................................... 19

*Arizona v. Maricopa Cnty. Med. Soc'y,*
  457 U.S. 332 (1982) ........................................................... 26

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council*
  *of Carpenters,*
  459 U.S. 519 (1983) ..................................................... 20, 31

*Bigelow v. RKO Radio Pictures,*
  327 U.S. 251 (1946) ........................................................... 36

*Blue Shield of Va. v. McCready,*
  457 U.S. 465 (1982) ......................................... 19, 22, 23, 28

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977) ..................................................... 17, 30

*Cal. Dental Ass'n v. FTC,*
  526 U.S. 756 (1999) ................................................. 26, 27, 30

*City of Oakland v. Oakland Raiders,*
  20 F.4th 441 (9th Cir. 2021) ................................. 36, 37, 38, 39, 40, 42

*DNAML Pty, Ltd. v. Apple Inc.,*
  25 F. Supp. 3d 422 (S.D.N.Y. 2014) ................................. 20, 21, 22, 24

*Flannery Associates LLC v. Barnes Family Ranch Associates,*
  *LLC,* No. 23-cv-00927, 2024 WL 1344663 (E.D. Cal. Mar.
  29, 2024) ................................................................. 39, 40, 43

iv

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.,*
711 F.3d 68 (2d Cir. 2013) .......................................... 16, 17, 21, 29, 35

*Gelboim v. Bank of Am. Corp.,*
823 F.3d 759 (2nd Cir. 2016) ......................16, 17, 19, 25, 27, 28, 42, 47

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n,*
744 F.2d 588 (7th Cir. 1984).............................................................. 26

*Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.,*
123 F.3d 301 (5th Cir. 1997)............................................................. 33

*In re DDAVP Direct Purchaser Antitrust Litig.,*
585 F.3d 677 (2d Cir. 2009) ............................19, 20, 21, 23, 35, 36, 46

*In re Pandora Media, LLC,*
No. 22-cv-00809, 2022 WL 19299126 (C.D. Cal. Oct. 26,
2022)...................................................................................... 40, 41, 42

*IQ Dental Supply, Inc. v. Henry Schein, Inc.,*
924 F.3d 57 (2nd Cir. 2019) ...................................... 15, 34, 36, 45, 46

*Lexmark International, Inc. v. Static Control Components,*
*Inc.,* 572 U.S. 118 (2014)............................................... 3, 14, 30, 31, 32

*Sprint Commc'ns, Inc. v. Jacobs,*
571 U.S. 69 (2013)............................................................................. 31

*United States v. Socony-Vacuum Oil Co.,*
310 U.S. 150 (1940)........................................................................... 25

*Yong Ki Hong v. KBS America, Inc.,*
951 F. Supp. 2d 402 (E.D.N.Y. 2013)............................................ 28, 29

**Statutes**

15 U.S.C. § 1 ....................................................................................... 4

15 U.S.C. § 15 ........................................................................... 4, 18, 33

15 U.S.C. § 26 ....................................................................................... 4

15 U.S.C. § 1125 ...................................................................... 32

28 U.S.C. § 1291 ........................................................................ 4

28 U.S.C. § 1331 ........................................................................ 4

28 U.S.C. § 1337 ........................................................................ 4

28 U.S.C. § 1367 ........................................................................ 4

**Rule**

Fed. R. Civ. P. 12(b)(6) .......................................................... 11

**Other Authorities**

*An Analysis of Antitrust Principles and Their Application* ¶
345 (4th ed. 2014, last updated May 2024) ....................... 23

## INTRODUCTION

This appeal seeks reversal of two legally erroneous rulings that, left undisturbed, will significantly harm private enforcement of the antitrust laws. *First*, the district court held that a distributor that refuses to pay the inflated prices demanded by a price-fixing conspiracy, and therefore loses customers and profits, has suffered no antitrust injury. *Second*, the court held that a distributor that loses profits because of a price-fixing conspiracy *specifically targeting that distributor* is not an "efficient enforcer" of the antitrust laws. Both holdings defy law and logic.

Plaintiff-Appellant DIRECTV distributes broadcast television content to millions of consumers via satellite and streaming services. It filed this antitrust suit to challenge a price-fixing conspiracy among Appellees—Nexstar Media Group, Inc. ("Nexstar"), Mission Broadcasting, Inc. ("Mission"), and White Knight Broadcasting, Inc ("White Knight")—each of whom owns broadcast rights for "Big-4" networks (ABC, CBS, FOX, and NBC) in key geographic markets.

Appellees entered into a series of three-year contracts giving DIRECTV the right to rebroadcast their content in specific markets. As their most recent contracts were set to expire in 2022, Appellees

conspired to illegally share information and coordinate negotiations to extract supracompetitive rates from DIRECTV. When DIRECTV refused to pay those rates, Appellees pulled their content in the relevant markets (including local news and weather). As a result, thousands of customers canceled their subscriptions. DIRECTV filed this action to obtain its lost profits and enjoin Appellees' violations of the federal antitrust laws.

Despite finding that DIRECTV has Article III standing based on its allegations of lost profits, the district court dismissed the case, holding that only a plaintiff that pays the supracompetitive prices demanded by a price-fixing conspiracy has an injury that gives it antitrust standing. Opinion and Order (Doc. 76,[1] "Order"). That holding is logically flawed and legally erroneous. It is contrary to fundamental principles of antitrust law, as well as cases from across the circuits establishing that (1) lost profits are a form of antitrust injury, and (2) a distributor has antitrust standing where it is forced to stop distributing the conspirators' products because it refuses to pay fixed prices and therefore loses profits. The district court's new bright-line rule that only a purchaser that pays a supracompetitive price can challenge a price-fixing conspiracy is also

---

[1] Document numbers refer to the district court docket, No. 1:23-cv-0221.

2

at odds with *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), where the Supreme Court rejected an attempt to impose similar limitations as part of a statutory standing analysis.

The district court also erred by holding that DIRECTV is not an efficient enforcer of the antitrust laws. The court ignored the direct connection between DIRECTV's injury (lost profits) and Appellees' unlawful conspiracy, which deprived DIRECTV of the ability to offer their programming. That causal link is both direct and non-speculative, making DIRECTV an appropriate plaintiff to enforce the antitrust laws. The court disregarded DIRECTV's well-pled allegations that Appellees' conspiracy targeted DIRECTV specifically, and instead wrongly assumed that there are other possible plaintiffs. And the court entirely failed to apply two prongs of the efficient enforcer analysis.

Left in place, the district court's decision will undermine private enforcement of the antitrust laws because it would require customers to pay illegally fixed prices before they can seek redress. That rule is inconsistent with Section 4 of the Clayton Act; antitrust standing case law; and Congress's intent in enacting the antitrust laws. This Court should reverse and allow DIRECTV's antitrust claims to proceed.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over DIRECTV's claims pursuant to 15 U.S.C. §§ 15 and 26, as well as 28 U.S.C. §§ 1331 and 1337, because DIRECTV asserted claims for violations of the Sherman Act, 15 U.S.C. § 1. DIRECTV also raised closely related state law claims under 28 U.S.C. § 1367, but the district court declined to exercise supplemental jurisdiction over those claims after it wrongly dismissed DIRECTV's federal antitrust claims. *See* Order at 15-17.

On April 12, 2024, DIRECTV filed a timely notice of appeal of the district court's March 20, 2024 Order dismissing all of DIRECTV's claims. This Court has jurisdiction over that final decision under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

(1) Did the district court err in dismissing DIRECTV's claims for lack of antitrust injury where DIRECTV, a television programming distributor, refused to pay illegally fixed prices demanded by Appellees for their television programming, resulting in a loss of subscribers and profits?

(2) Did the district court err in concluding that DIRECTV is not an "efficient enforcer" of the antitrust laws where DIRECTV was the direct target of the alleged conspiracy; its injury (lost profits) flows directly from that conspiracy; there are no other potential plaintiffs better situated or motivated to challenge the alleged conspiracy; and there is no risk of duplicative damages or recovery?

## STATEMENT OF THE CASE

This is an appeal from the district court's Rule 12(b)(6) dismissal of DIRECTV's antitrust claims. *See* Order (Doc. 76, Castel, S.J.).

### A.  The parties and their industry.

Appellants Nexstar, White Knight, and Mission are broadcasters that own local affiliates of popular television networks throughout the country in designated market areas ("DMAs"), *i.e.*, local geographic areas such as metropolitan New York City. Compl. ¶¶ 31–33. DIRECTV is a multichannel video programming distributor ("MVPD") that provides its customers with satellite and streaming access to popular broadcast television programming. *Id.* ¶ 3.

To attract customers, MVPDs bundle together packages of stations including, critically, local affiliates of the most popular local broadcast

networks: ABC, CBS, FOX, and NBC (the "Big-4"). *Id.* ¶¶ 1, 4, 63. To offer their subscribers a particular broadcast network, MVPDs negotiate to pay broadcasters or broadcast station groups like Appellees a "retransmission consent fee." *Id.* ¶ 4.

If negotiations fail, the broadcast station group stops providing its signals to the MVPD and its Big-4 station becomes "blacked out" to the MVPD's subscribers until a new agreement is reached. *Id.* ¶ 62. MVPDs want to avoid blackouts because, if there is a blackout, an MVPD will lose subscribers who are unwilling to pay for a portfolio of programming that no longer includes their preferred Big-4 station. *Id.* ¶ 63.

Both the FCC and DOJ have long taken the position that the retransmission consent market for Big-4 broadcast stations is a relevant antitrust product market. *Id.* ¶ 79. For this reason, federal law and regulations generally prohibit a single broadcast station group from owning, operating, or controlling two or more of the top-four rated stations (generally those channels affiliated with the Big-4 networks) in any given DMA; this is known as the "Duopoly Rule." *Id.* ¶ 5.

**B.    Nexstar's "sidecar" relationship with Mission and White Knight.**

Appellee Nexstar has engaged in a number of high-profile acquisitions of other broadcast groups to become the largest U.S. broadcaster, with 200 owned or operated stations in 116 U.S. markets. *Id.* ¶¶ 31, 48, 51, 65. The U.S. Department of Justice has repeatedly challenged these transactions as violations of the antitrust laws and required Nexstar to divest Big-4 stations in DMAs where a proposed acquisition would result in Nexstar owning more than one Big-4 station in a particular DMA. *Id.* ¶¶ 48–52.

Nexstar has developed a practice of transferring its divested Big-4 stations to "shell" station groups, known in the industry as "sidecars." *Id.* ¶ 55. FCC regulations require the sidecars to remain independent in key respects, perhaps most importantly, in the negotiation over retransmission consent fees for Big-4 stations in the same DMA. *Id.* ¶ 8. Joint negotiations would also be a clear violation of antitrust laws, which prohibit competitors from fixing prices or sharing competitively sensitive information, such as future pricing. *Id.* ¶ 5.

Nexstar has a long history of using sidecars, including Mission and White Knight. *Id.* ¶ 67. Nexstar has repeatedly used Mission as a

7

divestiture vehicle to acquire stations that overlapped with Nexstar's existing portfolio. *Id.* ¶¶ 68–69. Today, Mission owns Big-4 stations in 23 DMAs, all of which have a competing Nexstar Big-4 station. *Id.* ¶¶ 70–71. White Knight owns Big-4 stations in two DMAs, and Nexstar has a competing Big-4 station in both of these markets. *Id.* ¶¶ 73–74.

While Mission and White Knight are independently owned, Nexstar provides "consolidated financial reporting" to its investors because it has "power over significant activities affecting the sidecars' economic performance," and so is required to include their financial information in its own SEC filings. *Id.* ¶¶ 75–76. Nexstar has informed its investors that it has "received substantially all of the [sidecars'] available cash," and "anticipates it will continue to receive substantially all of the [sidecars'] available cash." *Id.* ¶ 75. Nexstar also has purchase options granted by the sidecars to acquire their stations' assets and assume their liabilities at any time. *Id.* ¶ 76.

## C. The price-fixing conspiracy.

In June 2022, DIRECTV began negotiating with Mission and White Knight, respectively, to renew their retransmission consent agreements. *Id.* ¶ 91. Despite repeated requests to speak with Mission's and White

Knight's senior executives, DIRECTV was informed all negotiations for both entities would be conducted by Eric Sahl, a supposedly "independent" consultant that in fact "answers directly to Nexstar." *Id.* ¶¶ 11–12, 92.

Sahl's conduct during negotiations confirmed that he answers to Nexstar, not the sidecars' purported management teams. During Mission's and White Knight's negotiations with DIRECTV, Sahl referenced non-public and highly confidential information regarding Nexstar's business strategies. *Id.* ¶¶ 16, 100–02, 129–36. Sahl also made demands that are against White Knight's and Mission's independent economic self-interest, and that would only benefit Nexstar. *Id.* ¶¶ 59, 98–99, 100–02, 116.

When DIRECTV refused to pay the supracompetitive fees Sahl demanded, Mission and White Knight issued materially identical press releases announcing the blackouts of their local stations on DIRECTV's service— which were also materially identical to a Nexstar press release about Nexstar's simultaneous blackout of stations offered through

Verizon. *Id.* ¶¶ 106–12. The identical statements in all three press releases clearly originated from the same source: Nexstar. *Id.* ¶ 113.[2]

Before and after blackouts commenced for both Mission and White Knight, DIRECTV again attempted unsuccessfully to engage their purported respective managements in negotiations. *Id.* ¶¶ 115–18. Sahl remained the only contact, and Mission's and White Knight's stations remain blacked out on DIRECTV. *Id.* ¶ 119. Since those stations are often an important source of local news, weather, and other "must have" programming, the blackout has caused many subscribers to leave DIRECTV, resulting in significant lost profits. *Id.* ¶¶ 170, 190, 202. DIRECTV therefore filed suit against Appellees to recover those lost profits and enjoin Appellees' unlawful coordination going forward. *See id.* pp. 39–41, 50.

**D.    The conspirators' motion to dismiss.**

Appellees moved to dismiss DIRECTV's antitrust claims[3] on multiple grounds, including that DIRECTV did not meet the

---

[2] Nexstar admitted as much in briefing below, explaining that shared services agreements between itself and the sidecars "might result in similarly worded press releases." Reply (Doc. 66) at 6.

[3] Appellees also sought dismissal of DIRECTV's state law claims, which the district court did not address on the merits because it declined to

redressability or traceability requirements of constitutional standing. Doc. 54 at 8–9. They also argued DIRECTV did not have antitrust standing because it did not pay the alleged supracompetitive prices and Appellees are not actual competitors in the retransmission consent market. *Id.* at 10–12. Appellees further argued DIRECTV did not allege (i) an illegal agreement, (ii) a cognizable relevant market, (iii) an unreasonable restraint on trade, (iv) an unlawful information exchange, and (v) necessary facts supporting DIRECTV's state law claims against Appellees. *Id.* at 13–47.

### E. The district court's decision.

On March 20, 2024, the district court issued the Order granting Appellees' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). The district court first held that DIRECTV's allegations established Article III standing to challenge Appellees' conspiracy. Order at 7–9. The court recognized that DIRECTV's request for lost profits was sufficient to establish redressability (*id.* at 8), and its plausible

---

exercise supplemental jurisdiction after dismissing the federal claims. Those claims accordingly are not at issue on appeal, but would be back in play should this Court reverse the decision below.

allegations that the parties would have reached agreement absent Appellees' anticompetitive behavior established traceability (*id.* at 8–9).

The district court next found that DIRECTV "readily satisfies the first two factors" of antitrust injury because it alleged horizontal price-fixing (a *per se* antitrust violation) and an "actual injury" in the form of lost profits "stemming from content blackouts." *Id.* at 10. But the court nonetheless concluded that DIRECTV's allegations did not establish antitrust standing. *Id.* at 10–15. The court's decision on that issue rested on two primary grounds.

*First*, the district court concluded that, because DIRECTV did not agree to pay Appellees' anticompetitive prices, DIRECTV lacks antitrust injury. *Id.* at 10–12. According to the district court, "Because 'DIRECTV has refused Defendants' supracompetitive, price-fixed demands,' Compl. ¶ 156, it cannot show that its lost profits flow from that which makes Defendants' price-fixing illegal." Order at 12.

*Second*, the district court also concluded DIRECTV was not an "efficient enforcer" of the antitrust laws because it did not pay the higher prices Appellees attempted to impose. *Id.* at 13–15. In the district court's view, "[n]on-purchasers are typically inefficient enforcers of the antitrust

12

laws, as their damages are both too indirect and speculative." *Id.* at 13. The court also asserted that there are more direct victims of Appellees' price-fixing conspiracy—a proposition not alleged in the complaint, not relevant to DIRECTV's injury, and based only on the court's unsupported assumptions regarding other MVPDs. *Id.* at 15 (asserting that the existence of "MVDPs [*sic*] who actually paid Defendants further attenuat[es] DIRECTV's antitrust standing").

The district court declined to exercise supplemental jurisdiction over DIRECTV's remaining state law claims. *Id.* at 16–17.

## SUMMARY OF ARGUMENT

I. The district court was wrong to hold that DIRECTV lacks antitrust injury because it refused to pay illegally fixed prices and instead suffered lost profits. Neither case law nor common sense supports a bright-line rule that a distributor must pay illegally fixed prices before it can enforce the antitrust laws against a price-fixing conspiracy.

The Supreme Court and this Court have repeatedly recognized that the prohibition against price-fixing is intended to protect free competition, and that the payment of inflated prices is not the only harm that results from price-fixing. This Court has held that lost profits and

the payment of overcharges are distinctive damages, either one of which may support antitrust standing.

The district court's contrary holding was based on a misreading of key cases, which in fact recognize that a *distributor* that refuses to pay supracompetitive prices and thus loses access to product or content—and thus profits—has suffered an antitrust injury and may sue to challenge the conspiracy. This Court should reverse and reaffirm that sensible interpretation of the antitrust injury requirement so that DIRECTV, and other conspiracy victims that choose not to accede to the conspiracy by paying supracompetitive prices, may enforce the antitrust laws.

The district court's bright-line rule that only a purchaser that pays illegally fixed prices has antitrust standing is also in conflict with the Supreme Court's decision in *Lexmark*, where the Court rejected an attempt to add a similar requirement to a statutory standing analysis. Like the provision at issue in *Lexmark*, Section 4 of the Clayton Act broadly grants a claim for relief to any person injured by actions prohibited by the antitrust laws, and provides no basis for limiting price-fixing claims to purchasers who paid supracompetitive prices. This Court should reject the district court's attempt to impose such a constraint.

14

II.    The district court's holding that DIRECTV is not an efficient enforcer of the antitrust laws—although DIRECTV is the most direct target of the conspiracy—was based on a series of legal errors.

To begin, the district court ignored DIRECTV's well-pled allegations that it was the victim of a targeted conspiracy aimed directly at DIRECTV by Appellees, which caused DIRECTV to lose subscribers and thus profits—just as Appellees intended. The case law does not support the court's contrary finding that DIRECTV's injury is remote and speculative, but rather reaffirms that a distributor may enforce the antitrust laws where it loses profits from a price-fixing conspiracy.

The court also wrongly asserted, contrary to the Rule 12 requirement that all factual allegations must be construed in the plaintiff's favor, that there are other plaintiffs better situated to challenge Appellees' conduct. That is neither alleged in the complaint nor consistent with DIRECTV's allegations.

The district court also failed to analyze two other prongs of the efficient enforcer analysis: whether DIRECTV is sufficiently motivated to challenge the unlawful conspiracy (it is), and whether there is a

potential for duplicative recovery if DIRECTV prevails (there is not). This failure to complete the efficient enforcer analysis also requires reversal.

## STANDARD OF REVIEW

This court "review[s] the district court's grant of a motion to dismiss *de novo*," "accept[ing] as true all factual claims and draw[ing] all reasonable inferences in [the non-movant's] favor." *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 62 (2nd Cir. 2019); *see also Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 765, 769, 772 (2nd Cir. 2016) (vacating dismissal for lack of antitrust standing on *de novo* review).

## ARGUMENT

The district court wrongly concluded that DIRECTV lacks antitrust standing because it suffered lost profits rather than paying the supracompetitive prices demanded by Appellees. That counterintuitive conclusion is inconsistent with the text of Section 4 of the Clayton Act, well-established principles of antitrust standing, and relevant case law.

The Second Circuit has distilled the antitrust standing inquiry into two prongs, requiring a plaintiff to plead: (1) that it has suffered an "antitrust injury," and (2) that it is an "efficient enforcer" of the antitrust laws. *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir.

16

2013). The district court misapplied the law and misconstrued the allegations to hold that DIRECTV lacks an antitrust injury and is not an efficient enforcer of the antitrust laws.

## I.   DIRECTV has suffered an antitrust injury—lost profits—that flows from Appellees' price-fixing conspiracy.

The Supreme Court has defined an antitrust injury as an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). As this Court has explained, "[a]n antitrust injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Gelboim*, 823 F.3d at 772 (cleaned up).

In this Circuit, the antitrust injury analysis follows a three-step process: (1) the plaintiff must identify the practice complained of and the reasons that practice is anticompetitive; (2) the court must identify the injury the plaintiff alleges; and (3) the court must compare the anticompetitive effect of the specific practice at issue to the injury the plaintiff alleges. *Gatt*, 711 F.3d at 76. The district court's dismissal of DIRECTV's claims was based on the third step of that analysis, and that ruling rests on fundamental errors of antitrust law.

17

In its Order, the district court acknowledged that DIRECTV "readily satisfies" the first two steps of the antitrust injury analysis because DIRECTV (1) "alleges that Defendants have engaged in a horizontal price-fixing conspiracy," and (2) "identifies its actual injury: lost profits." Order at 10. But the court held that DIRECTV failed on the third prong because an antitrust plaintiff in a price-fixing conspiracy case "*must* show that it actually paid supracompetitive rates to establish antitrust injury." *Id.* at 12 (emphasis added).

The district court's error rests on the flawed premise that the only "antitrust harm that flows from horizontal price fixing is the payment of supracompetitive prices." *Id.* at 10. But an overcharge is not the only harm that results from price-fixing, and the district court's holding to the contrary was plain legal error. That error, based on a misreading of key cases, tainted the remainder of the district court's analysis and led to its conclusion that DIRECTV's lost profits—despite flowing from the harm intentionally caused by Appellees when DIRECTV refused to accede to their price-fixing conspiracy—are not an antitrust injury. This Court should reject the district court's new bright-line rule limiting price-fixing claims to plaintiffs that agreed to pay supracompetitive prices.

18

**A.**  **The district court's holding that only a purchaser who pays supracompetitive prices may challenge a price-fixing conspiracy is contrary to precedent holding that lost profits are a form of antitrust injury.**

Section 4 of the Clayton Act broadly provides a claim for relief to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. This Court has noted that "the 'unrestrictive language of [§ 4], and the avowed breadth of the congressional purpose' in enacting this remedial provision 'cautions [courts] not to cabin § 4 in ways that will defeat its broad remedial objective.'" *Gelboim*, 823 F.3d at 777 (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 477 (1982)).

The district court did exactly that here—interpreted Section 4 in a way that defeats its broad remedial objective—when it held that DIRECTV has not suffered antitrust injury because it (i) refused to pay the supracompetitive prices demanded by Appellees, and (ii) instead suffered lost profits resulting from the blackout of Appellees' stations. That decision is contrary to precedent from this Court recognizing that "lost profits and overcharges are distinct injuries," either one of which may support a finding of antitrust standing. *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009).

19

In *DDAVP*, this Court relied on the decision in *Andrx Pharmaceuticals, Inc. v. Biovail Corp. International*, 256 F.3d 799, 817 (D.C. Cir. 2001), which acknowledges that lost profits are a prototypical antitrust injury where, as here, they are premised on "the loss of profits [a plaintiff] would have otherwise made had it not been excluded from the market." *Id.* at 816. As recognized in *DDAVP*, antitrust standing is a context-specific analysis, and establishing any bright-line rule to favor one form of damage over another is "likely to leave a significant antitrust violation undetected or unremedied." *DDAVP*, 585 F.3d at 689 (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 542 (1983)).

Here, the district court's rule requiring payment of overcharges to support antitrust standing would have precisely that effect, leaving a significant antitrust violation unremedied. That result is neither required by nor consistent with the case law on which the court relied, which mandates a finding that DIRECTV has adequately alleged antitrust injury in the form of lost profits. The decision in *DNAML Pty, Ltd. v. Apple Inc.*, 25 F. Supp. 3d 422, 429 (S.D.N.Y. 2014), is directly on point and reached this precise conclusion.

20

In *DNAML*, an independent eBook retail distributor brought claims arising from a price-fixing conspiracy among eBook publishers and Apple. The distributor alleged that by artificially inflating the prices for licensing the publisher's e-books, the price-fixing conspiracy forced the distributor to stop offering the conspirators' products, causing it to suffer lost profits. Denying a motion to dismiss, the district court firmly rejected the premise that lost profits do not establish antitrust injury:

> [Defendants] erroneously assert that a distributor's lost profits cannot constitute antitrust injury from a price-fixing scheme, and that the only cognizable injury is the payment of inflated prices to the manufacturer, citing *Gatt*. . . . *Gatt* does not stand for the broad proposition that a distributor's lost profits from a manufacturer's price-fixing conspiracy do not constitute antitrust injury. Lost profits and the payment of inflated prices are "two ... conceptually different measures" of damages for antitrust injuries. *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009). *A claim for lost profits can constitute a cognizable antitrust injury in the appropriate case*.

*Id.* at 429 (emphasis added).

Here, the district court purported to agree with *DNAML*, but fundamentally misread the facts of that case to hold that it was distinguishable because "DIRECTV is not a competitor of the Defendants, as the plaintiff was in *DNAML*." Order at 12. But in *DNAML*, the plaintiff was a distributor that *did not* compete with the

21

publishers, and the court expressly relied on the fact that it was *not* a competitor as a key aspect of its antitrust injury analysis. *See* 25 F. Supp. 3d at 429 (emphasizing that the plaintiff was "*not a competitor* of the conspiring Publishers" and thus "could not undercut the Publishers' artificially inflated prices") (emphasis added). The district court's attempt to factually distinguish the cases thus was wrong; DIRECTV and DNAML are similarly situated distributors, and they are equally direct victims of a price-fixing conspiracy.

Making another erroneous distinction, the district court misread *DNAML* to reason that "the goal of the conspiracy in *DNAML* was to oust the discounter from the market" and thus "lost profits stemming from that exclusion flowed from that which made defendants' conduct illegal." Order at 12. But the plaintiff in *DNAML* sued after the Department of Justice had already proven that eBook publishers colluded with Apple to raise the price of e-books in general. 25 F. Supp. 3d at 426. And there, the distributor's exclusion from the market was not a goal of the conspiracy at all; it was simply a consequence of the conspiracy's true objective—to raise the price of eBooks. Under those facts, the district court correctly observed that the plaintiff's injury was "not some far-flung consequence

of defendants' price-fixing, but rather is 'precisely the type of loss that [defendants' conduct] would be likely to cause.'" *Id.* at 429 (quoting *McCready*, 457 U.S. at 479).

The same is true here. DIRECTV's lost profits in the form of lost subscribers is precisely the type of loss Appellees' price-fixing conspiracy would cause and is "'inextricably intertwined' with the conduct's anti-competitive effects." *DDAVP*, 585 F.3d at 688 (quoting *McCready*, 457 U.S. at 484). Indeed, DIRECTV alleges that Appellees use the threat of "potential subscriber losses associated with a broadcast station group's stations going dark" to increase their bargaining leverage. Compl. ¶ 64. Thus, lost profits due to subscriber losses resulting from station blackouts is not *a* possible harm from Appellees' price-fixing conspiracy; it is *the* predictable and intended effect of the conspiracy should DIRECTV not accede to supracompetitive rates.

The district court also relied on a single sentence from an antitrust law treatise taken out of context: "'[A] *consumer* cannot obtain damages without showing that she actually paid more or received less than she would have in the absence of the violation.'" Order at 12 (quoting IIA Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of*

*Antitrust Principles and Their Application* ¶ 345 (4th ed. 2014, last updated May 2024)). But that section of the treatise goes on to clarify:

> *"Consumer" in the sense used here generally means the end-use purchaser*, who most typically sues for overcharge damages resulting from illegal price fixing, monopolization or, less frequently, a merger. Not all those who purchase from the antitrust defendant are "consumers" in this sense. *For example, dealers purchasing for resale are not consumers, although they too have standing to challenge illegal overcharges and other violations.*

Areeda & Hovenkamp, ¶ 345 (emphases added, citations omitted). Read in full, this passage makes clear that DIRECTV, a distributor, is not the ordinary "consumer" addressed in the cited sentence. And the treatise further explains that, even for a traditional consumer, "if the threat or the actual financial injury is real, *standing is virtually always granted.*" *Id.* (emphases added). Here, DIRECTV alleged a very real, actual financial injury: lost profits flowing directly from Appellees' unlawful conduct. Standing therefore should be granted.

DIRECTV pled all that is required to allege antitrust injury—and more. The fact that the damages DIRECTV incurred from the conspiracy are lost profits rather than overcharges is of no moment because "[a] claim for lost profits can constitute a cognizable antitrust injury in the appropriate case." *DNAML*, 25 F. Supp. 3d at 429. This is such a case.

The district court in *DNAML* properly analyzed antitrust injury; the district court here did not.

### B. DIRECTV's injury flows directly from an anticompetitive effect of Appellees' price-fixing conspiracy.

By holding that DIRECTV's loss of subscribers, and therefore profits, as a direct result of Appellees' unlawful conspiracy is not an antitrust injury, the district court ignored fundamental principles of antitrust law—including that unlawful price-fixing agreements have multiple anticompetitive effects beyond increased prices.

Price fixing is unlawful because it disrupts the competitive process that drives the nation's economy, innovation, and consumer welfare—not just because it results in inflated prices to the detriment of purchasers. As this Court emphasized, "[a]ny combination which tampers with price structures is engaged in an unlawful activity" because the conspirators are "interfering with the free play of market forces." *Gelboim*, 823 F.3d at 773 (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221 (1940)). Put another way, price-fixing agreements "deprive[] the marketplace of [the] independent centers of decisionmaking that competition assumes and demands." *Am. Needle, Inc. v. Nat'l Football*

*League*, 560 U.S. 183, 190 (2010) (internal quotation and citation omitted).

There is no authority for the district court's proposition that the prohibition on price-fixing is concerned solely with the payment of increased prices. In fact, the Supreme Court has held exactly the opposite, emphasizing that application of the "*per se* rule" to horizontal price fixing conspiracies "is grounded on faith in price competition as a market force [and not] on a policy of low selling prices at the price of eliminating competition." *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 348 (1982) (citation omitted). The Supreme Court has also explained that price-fixing agreements harm competition by artificially reducing output, noting: "If firms raise price, the market's demand for their product will fall, so the amount supplied will fall too—in other words, output will be restricted." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 777 (1999) (quoting *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594–95 (7th Cir. 1984)). Thus, contrary to the district court's view, it is the disruption of competition—and not just the payment of high prices—that makes price-fixing agreements unlawful.

Here, Appellees' price-fixing conspiracy disrupted competition by forcing DIRECTV to stop offering Appellees' programming. That is exactly the type of restriction in output that the Supreme Court has recognized as a form of anticompetitive harm flowing from a price-fixing agreement. *See id.* And DIRECTV's reduced offerings predictably led to lost subscribers and profits.

The district court acknowledged as much, but it concluded this form of damages was not an antitrust injury because it did not "flow from that which makes Defendants' acts unlawful": "pa[ying] anticompetitive rates." Order at 11. When viewed through the proper lens of why price-fixing agreements are unlawful, this holding cannot withstand analysis.

This Court's decision in *Gelboim* explains that price-fixing causes harms beyond increased prices and illustrates the district court's error. In *Gelboim*, the plaintiffs held financial instruments at interest rates that referenced LIBOR (the London Interbank Offered Rate). 823 F.3d at 765. The plaintiffs alleged that the banks engaged in a price-fixing agreement to depress LIBOR, such that the payout associated with plaintiffs' financial instruments was lower than it would have been. *Id.* at 764. The district court dismissed for lack of antitrust injury, and this

Court reversed. Consistent with the broader body of price-fixing case law discussed above, the panel observed:

> While an increase in price resulting from a dampening of competitive market forces is assuredly one type of injury for which § 4 potentially offers redress, *that is not the only form of injury remediable under § 4.*

*Id.* at 774 (quoting *McCready*, 457 U.S. at 482–83) (emphasis added). Based on this principle, this Court held: "Appellants have plausibly alleged antitrust injury. They have identified an illegal anticompetitive practice (horizontal price-fixing), have claimed an actual injury placing appellants in a worse position as a consequence of the Banks' conduct, and have demonstrated that their injury is one the antitrust laws were designed to prevent." *Id.* at 774–75 (cleaned up).

This Court's reasoning in *Gelboim* applies equally here. DIRECTV alleged horizontal price-fixing that placed it in a worse position as a consequence of Appellees' conduct, making its product less desirable to subscribers, many of whom then defected. Thus, as in *Gelboim*, DIRECTV's lost profits flowed from the "dampening of competitive market forces" and are a cognizable injury that "the antitrust laws were designed to prevent." *Id.*

The district court's much narrower view of price fixing and the harms it causes was wrong. Quoting *Yong Ki Hong v. KBS America, Inc.*, 951 F. Supp. 2d 402, 418 (E.D.N.Y. 2013)—a case decided at the summary judgment stage, not on a motion to dismiss—the court below asserted that "horizontal price-fixing schemes are illegal under the antitrust laws *only because* of the harm they may cause—increased prices—to *purchasers* of the product for which prices have been fixed." Order at 10–11 (cleaned up, first emphasis added). But in *Yong Ki Hong*, the plaintiff video store owners did not allege that they were *the target* of a price-fixing scheme. Instead, "Plaintiffs' chief contention [wa]s that [Defendants] cut off their supply of [] videos" when plaintiffs refused to "enter[ ] into an agreement to charge a uniform $1.50 price for video rentals"—*i.e.*, to join a price-fixing conspiracy. 951 F. Supp. 2d at 412–13, 416. Under those circumstances, the court held that plaintiff's damages did not "flow[] from that which makes the defendants' acts unlawful under the antitrust laws." *Id.* at 417 (internal quotation marks and citation omitted).[4]

---

[4] The *Yong Ki Hong* court relied on *Gatt*, which found that a plaintiff lacked antitrust standing where it alleged damages based on its refusal to participate in a bid-rigging scheme with competitors. The Court held that the antitrust laws "are not concerned with injuries to *competitors* such as Gatt resulting from their participation in or exile from such

29

The circumstances here are very different. Unlike in *Yong Ki Hong*, DIRECTV was the direct *target* of a price-fixing conspiracy that was specifically intended to force DIRECTV to accede to higher prices or face the loss of programming. That reduction in output is precisely the type of competitive harm that the Supreme Court has explained the proscription on price-fixing is intended to prevent. *See Cal. Dental*, 526 U.S. at 777. DIRECTV's lost profits thus "flow[] from that which makes [price fixing] unlawful," *Brunswick Corp.*, 429 U.S. at 489, and are remediable under the federal antitrust laws.

## C. The district court's new requirement for claimants seeking to challenge a price-fixing conspiracy is at odds with the Supreme Court's decision in *Lexmark*.

In addition to being inconsistent with relevant case law and fundamental antitrust law principles, the district court's bright-line rule that lost profits cannot support antitrust injury from a price-fixing conspiracy runs headlong into the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), where the Supreme Court rejected a similar attempt to raise a

---

schemes." 711 F.3d at 77. DIRECTV is not a competitor of Appellees; it is a distributor, and thus in a fundamentally different position.

statutory standing bar. By reversing the decision below and rejecting the district court's new bright-line limitation on price-fixing claims, this Court can avoid a *Lexmark* issue and thereby ensure that the courts in this Circuit honor their "virtually unflagging" "obligation to hear and decide cases within [their] jurisdiction." *Id.* at 126 (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013)).

In *Lexmark*, the Supreme Court addressed statutory standing in the context of a claim for violations of the Lanham Act, considering the defendant's proposal that the court adopt either (a) "a multifactor balancing test," or (b) "a categorical test permitting only direct competitors to sue for false advertising." *Id.* at 134. The Supreme Court rejected both of these proposed approaches to statutory standing.

Notably, the five-factor balancing test that the Court rejected was "derived from" an antitrust case, *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983),[5] and bears some similarity to the current antitrust standing

---

[5] Dissenting in *Associated General Contractors*, Justice Marshall criticized the application of a balancing analysis as "impos[ing] an unwarranted judge-made limitation on the antitrust laws" (459 U.S. at 546), warning: "Dismissal for failure to state a claim is too crude a procedural device to be used to vindicate the 'interest ... in keeping the

inquiry, instructing consideration of, *inter alia*, whether the injury is direct and non-speculative and whether there is a risk of duplicative damages. *See Lexmark*, 572 U.S. at 134–35. The Court called the proposed application of that balancing test to restrict statutory standing "off the mark," including because "potential difficulty in ascertaining and apportioning damages is not . . . an *independent* basis for denying standing" and "open-ended balancing tests[] can yield unpredictable and at times arbitrary results." *Id.* at 135–36.

The Court was even more skeptical of the counterclaim-defendant's proposed "bright-line rule" that only direct competitors could bring claims, noting that such a rule provides clarity "at the expense of distorting the statutory language." *Id.* at 136. While "a plaintiff who does not compete with the defendant will often have a harder time establishing proximate causation[,] . . . a rule categorically prohibiting all suits by noncompetitors would read too much into the [Lanham Act provision authorizing suits]." *Id.*

---

scope of antitrust trials within judicially manageable limits.'" *Id.* at 552 (citation omitted). While the Court need not reach the issue to determine that the district court's rule for price-fixing claims is invalid, it is arguable that, after *Lexmark*, Justice Marshall's dissent better reflects the state of the law than the majority opinion.

The Lanham Act's provision authorizing suit by "*any person* who believes that he or she is or is likely to be damaged" by false advertising, 15 U.S.C. § 1125 (emphasis added), is textually similar to Section 4 of the Clayton Act, which provides a cause of action to "*any person* who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15 (emphasis added). Thus, *Lexmark*'s rejection of both an overly-strenuous balancing test and a bright-line rule limiting claims to certain types of plaintiffs is relevant here. As the Fifth Circuit advised, standing should not become like "the tail wagging the dog" when a plaintiff has alleged facts that describe conduct forbidden by the antitrust laws and a resulting injury that is exactly what the conspirators intended. *Dr.'s Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 306 (5th Cir. 1997).

As discussed above, precedent does not support, much less require, the district court's bright-line rule limiting claims for price-fixing conspiracies to plaintiffs that agreed to pay the resulting supracompetitive price. This Court should therefore decline to interpret the broad text of Section 4 of the Clayton Act as imposing that constraint.

## II. As the target of Appellees' conspiracy, DIRECTV is an efficient enforcer of the antitrust laws.

To support its second ground for dismissal based on lack of standing, the district court reached the remarkable conclusion that DIRECTV is not an "efficient enforcer" of the antitrust laws. Its analysis was rife with legal errors.

This Court has identified four factors to determine whether a plaintiff is an efficient enforcer of the antitrust laws:

> (1) the directness or indirectness of the asserted injury, (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement, (3) the speculativeness of the alleged injury, and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

*IQ Dental Supply*, 924 F.3d at 65 (internal quotation and citations omitted). A plaintiff need not satisfy all four factors and "the relative significance of each factor will depend on the circumstances of the particular case." *Id*. But all four factors must be considered. *See id.* at 65–68 (discussing all factors and applying them to each antitrust claim).

Here, the district court wrongly applied two factors of the efficient enforcer analysis and failed to consider the other two, both of which weigh heavily in favor of DIRECTV. It thus piled error upon error.

34

A.  **The district court wrongly found DIRECTV's injury to be indirect and speculative because DIRECTV is a "non-purchaser."**

The district court misinterpreted factors (1) and (3) of the efficient enforcer analysis. Disregarding DIRECTV's allegations of a direct injury, the court decided that the injury, lost profits, was indirect, remote, and speculative because DIRECTV did not pay the supracompetitive rates demanded by Appellees. Order at 13. That was error.

As this Court explained in *Gatt*, "[d]irectness in the antitrust context means close in the chain of causation." 711 F.3d at 78 (internal quotation marks and citation omitted). That standard is easily met here, where DIRECTV alleged that it was the *direct, intended target* of Appellees' conspiracy to fix prices for the parties' retransmission agreements, which directly and predictably caused DIRECTV to lose subscribers and thus profits. *See* Compl. ¶¶ 156–58, 170–71. DIRECTV also specifically alleged that Appellees used the threat of a blackout to pressure it to accept high retransmission fees precisely because a blackout will result in lost subscribers, and thus lost profits. *Id.* ¶¶ 62–63. There is thus nothing "remote" or indirect about the injury DIRECTV

alleged; it was precisely the injury that Appellees intended to cause if DIRECTV refused to accept Appellees' price-fixed retransmission fees.

Nor is there any basis to conclude that DIRECTV's allegations that it lost profits from the conspiracy are impermissibly speculative. To the contrary, "such damages would relate to instances of potentially ascertainable business losses. The value of each lost opportunity might be calculated based on [DIRECTV's] historical sales data without undue speculation." *IQ Dental Supply*, 924 F.3d at 68. To the extent lost profit calculations entail some degree of uncertainty, it is a longstanding maxim of antitrust law (and damages law in general) that "the most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946); *DDAVP*, 585 F.3d at 689 (same).

The district court's conclusion that DIRECTV's alleged injury was too indirect and speculative to make it an efficient enforcer of the antitrust laws was based on two core legal errors. *First*, the court misapplied the Ninth Circuit's decision in *City of Oakland v. Oakland Raiders*, 20 F.4th 441 (9th Cir. 2021), while inexplicably failing to

36

address subsequent authorities confirming that distributors that lose access to content—and therefore profits—as the result of a price-fixing conspiracy may sue to challenge that conspiracy. *Second*, the district court failed to accept DIRECTV's well-pled factual allegations that Appellees directly and specifically targeted DIRECTV with their price-fixing conspiracy, and instead assumed the existence of other plaintiffs better positioned to sue Appellees. There are none.

### 1. The district court misapplied a Ninth Circuit case and ignored more relevant case law.

To conclude that DIRECTV's alleged injury (lost profits) was too indirect and speculative, the court wrongly analogized this case to *City of Oakland*. That case arose out of an extraordinary and unique situation, which bears no resemblance to the facts here. Oakland sued the National Football League ("NFL") after the Raiders moved from Oakland to Las Vegas, alleging that it was unable to retain the Raiders or attract a new team because of a conspiracy in which NFL policies "dr[ove] up the prices demanded of and paid by host cities." *City of Oakland*, 20 F.4th at 450. The Ninth Circuit found it too speculative for Oakland to suggest that "in the absence of Defendants' challenged practices, it would have retained the Raiders (or acquired another team)," explaining:

> [T]here is no way of knowing—what would have occurred in a more competitive marketplace. Would new teams have joined the NFL? Would they have found Oakland attractive? Would the Raiders have left Oakland in any event? . . . Would the City have been willing and able to pay a competitive price?

*Id.* at 459–60.

No such speculation is required here, where the parties had a longstanding history of reaching agreements every three years that allowed DIRECTV to retransmit Appellees' content at a reasonable price. Based on the alleged facts, the district court should have presumed that, but for the conspiracy, the parties would have continued their longstanding relationship and entered into another retransmission agreement—thereby avoiding injury to DIRECTV. The allegations here thus bear no resemblance to the unique situation in *City of Oakland*, where there was no plausible basis to conclude that, but for the alleged conspiracy, Oakland could have attracted another NFL team (a notoriously difficult and costly undertaking that many U.S. cities have been unable to achieve) or kept the Raiders from moving to Las Vegas.

The district court ignored another very important aspect of *City of Oakland*: the Ninth Circuit explicitly recognized that non-purchasers *can* have standing to challenge an unlawful conspiracy *where there is a*

*regular course of past dealing.* The court explained that, in *Montreal Trading* (on which it relied), the court "did not adopt a bright-line rule precluding nonpurchasers who have been priced out of a market from establishing antitrust standing. . . . We agree." *Id.* at 459 n.11. It then reaffirmed that standing remains available to a plaintiff who could show "a regular course of dealing with the conspirators." *Id.* at 460 (internal quotation marks and citation omitted). Oakland, however, could make no such showing; having attracted a team only once before in a non-competitive market, "[t]he City's past dealings with the Raiders [] do not establish a *regular* course of dealing." *Id.*

Here, in contrast, there is a regular course of past dealing between DIRECTV and Appellees, which entered into multiple 3-year retransmission agreements. Compl. ¶ 126. Thus, *City of Oakland* does not support denying antitrust standing here. Rather, it indicates that standing exists in precisely this type of situation: where a longtime distributor, which entered into multiple past agreements with its content providers, is prevented from entering into new agreements due to an unlawful price-fixing conspiracy between those providers.

39

Indeed, a court in the Ninth Circuit recently rejected a similar attempt to apply *City of Oakland* to bar a price-fixing claim for lost profits, relying on the prior course of dealing between plaintiff and the alleged landowner conspirators. In *Flannery Associates LLC v. Barnes Family Ranch Associates, LLC*, No. 23-cv-00927, 2024 WL 1344663, at *6–8 (E.D. Cal. Mar. 29, 2024), the plaintiff had a long history of purchasing land in the area, but alleged that landowners then colluded to drive up prices. The court found that the plaintiff had shown a sufficiently direct injury by alleging "its lost profit damages flow directly from Defendants' decision to only sell to Plaintiff at supracompetitive levels," and that its claimed damages were not speculative because "Plaintiff does allege with a reasonable level of certainty that Defendants . . . would have sold [ ] to Plaintiff, but for Defendants' anticompetitive conduct." *Id.* at *8.

This case is also very similar to *In re Pandora Media, LLC*, No. 22-cv-00809, 2022 WL 19299126, at *7 (C.D. Cal. Oct. 26, 2022)—which the district court failed to address even though DIRECTV discussed it at length in its brief below.[6] In *Pandora*, the court found the antitrust

---

[6] *Compare* Pl. Opp. (Doc. 60) at 15 & 20 *with* Order at 9–15.

counterclaim plaintiff, a streaming service, adequately alleged antitrust injury by asserting it stopped streaming comedy recordings because defendants conspired to request supracompetitive royalties. *Id.* at *6–7. The court reasoned that, "[u]nlike in *City of Oakland*, [plaintiff] alleges links in the chain of causation that are not speculative." *Id.* at *7. And it pointed to the fact that, before the anti-competitive conduct, Pandora had entered into licensing agreements with individual comedians, thus providing the "necessary context" and a "status quo" against which to assess the supracompetitive licensing fees. *Id.*

These facts are practically indistinguishable from the facts here. Like the claimant streaming service in *Pandora*, DIRECTV alleged that, because it did not pay the supracompetitive fees unlawfully demanded by the defendant-conspirators, it lost the ability to offer certain content, causing lost profits. Thus, just as in *Pandora*, there is a clear, direct connection between the unlawful conduct of the conspirators and the injury that DIRECTV sustained. And like the antitrust claimant in *Pandora*, DIRECTV alleged facts regarding the prior agreements it entered into with Appellees, thus establishing a "status quo" and the "necessary context" for the court to assess whether the claimed fees were

in fact supracompetitive and thereby caused injury. 2022 WL 19299126, at \*6-7. Finally, and of key importance here, *Pandora* firmly rejected the assertion that the plaintiff content distributor had to agree to the supracompetitive fees to challenge the conduct leading to them as a violation of the antitrust laws. *Id.* at \*6.

The connection between Appellees' alleged unlawful conspiracy and DIRECTV's alleged injury is much more like the connection alleged in *Pandora*—which similarly dealt with conduct that unlawfully prevented the renewal of agreements allowing the distribution of media content—than the unique, one-off situation addressed in *City of Oakland*. Indeed, DIRECTV is in an even stronger position than the *Pandora* price-fixing claimant in that DIRECTV alleged a long history of prior dealings with Appellees that resulted in many past, multi-year retransmission agreements. Compl. ¶ 126. Having disregarded these well-pled allegations, the district court wrongfully concluded that DIRECTV's injuries were too speculative.

**2. Rather than accepting DIRECTV's allegations, the court wrongly assumed that there are other, more direct victims of Appellees' conspiracy better positioned to enforce the antitrust laws.**

In addition to being unsupported by case law, the district court's conclusion that DIRECTV is not an efficient enforcer of the antitrust laws was contrary to the court's obligation at the Rule 12 stage to accept DIRECTV's allegations —not infer facts contrary to them. *See Gelboim*, 823 F.3d at 769 (courts must "accept[ ] as true all factual claims in the complaint and draw[ ] all reasonable inferences in the plaintiff's favor") (internal quotation marks and citation omitted).

In concluding that DIRECTV's injury was too indirect and speculative to make it an efficient enforcer of the antitrust laws, the district court wrongly assumed the existence of other victims of Appellees' conspiracy. Order at 15 ("The uncertainty of Plaintiff's injuries stands in stark contrast to the MVDPs [*sic*] who actually paid Defendants."). But DIRECTV did not allege that Appellees targeted other MVPDs with the same price-fixing conduct, or that other MVPDs paid fixed prices. Indeed, DIRECTV could not do so since other MVPDs would not be bound by the retransmission agreements at issue here, and DIRECTV has no way of knowing if other MVPDs have been similarly

43

targeted by Appellees and (if so) whether they acceded to the conspiracy and paid supracompetitive prices. Rather, as in *Flannery Associates*, where the court *rejected* the assertion that only a purchaser could sustain a claim for lost profits, "throughout the Complaint, Plaintiff alleges it was the sole target of a price-fixing conspiracy initiated by Defendants against Plaintiff." 2024 WL 1344663, at *7.

Here, DIRECTV specifically alleged that Appellees: (i) engaged Eric Sahl to coordinate their negotiations *with DIRECTV* at the direction of Nexstar; (ii) unlawfully shared *DIRECTV's pricing information*; (iii) coordinated the content of negotiations and public pressure campaigns specific to the *DIRECTV negotiations*; and (iv) did so for the purpose of obtaining supracompetitive pricing *from DIRECTV specifically*. *See* Statement of the Case § C, *supra*. Nothing in the complaint supports the district court's assertion that there are other MVPDs who were targets of Appellees' conspiracy but paid the supracompetitive prices. And even if Appellees similarly conspired to raise prices for other MVPDs (facts currently unknown and unalleged), that would not necessarily make them better positioned to challenge the conspiracy. Indeed, MVPDs that paid price-fixed retransmission fees and signed multi-year agreements

with Appellees likely would have a strong disincentive to then sue Appellees and thereby jeopardize an ongoing business relationship.

The district court was wrong to presume the existence of other, more direct victims of Appellees' conspiracy at the Rule 12 stage, rather than accepting DIRECTV's allegations that it was the direct and intended target of that conspiracy. This failure to properly apply the Rule 12 standard of review is fatal to the court's efficient enforcer analysis.

### B.  The district court wrongly ignored two factors of the efficient enforcer analysis.

After misapplying the "direct" and "speculative" factors of the efficient enforcer analysis (factors (1) and (3)), the district court erred yet again by ignoring the other two factors of the analysis: factor (2), whether DIRECTV is sufficiently motivated to "vindicate the public interest in antitrust enforcement"; and factor (4), whether there is a risk of duplicative recovery. *IQ Dental Supply*, 924 F.3d at 65. Both factors strongly support allowing DIRECTV to seek damages from Appellees and enjoin their unlawful conspiracy. The district court's failure to discuss those factors—let alone weigh them—is a fatal flaw requiring reversal.

### 1. As the direct target of the conspiracy, DIRECTV is motivated to enforce the antitrust laws against Appellees.

As a direct purchaser in the retransmission market with a long history of obtaining content from the Appellees, DIRECTV is part of "an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement." *Id.*

Indeed, as the *direct and only known target* of Appellees' price-fixing conduct as alleged in the complaint, DIRECTV is not only "significantly motivated" to bring antitrust claims "due to [its] 'natural economic self-interest' in paying the lowest price possible" to rebroadcast Appellees' stations, but "the most motivated." *DDAVP*, 585 F.3d at 689 (citation omitted). The district court's passing reference to other MVPDs "who actually paid Defendants" (Order at 15) says nothing about such MVPDs' ability or motivation to prosecute a similar antitrust claim. The district court was wrong to ignore the clear motivation of DIRECTV to seek recovery for its own damages, disregarding factor (2) of the efficient enforcer analysis.

### 2. There is no risk of duplicative recovery.

The district court also ignored factor (4), under which there is no danger of duplicative recovery here, and no need for "apportioning

46

[damages] among direct and indirect victims" because the injuries alleged in the complaint "are specific to [DIRECTV] alone." *IQ Dental Supply*, 924 F.3d at 65, 68.

As alleged in the complaint, the damages DIRECTV seeks to recover—the profits DIRECTV lost when it lost subscribers after Appellees blacked out their programming on DIRECTV's platform—are specific to DIRECTV. No other person or entity would have any basis to recover those particular damages.

The district court's failure to fully consider and properly apply the four factors of the efficient enforcer analysis is reversible error. *Gelboim*, 823 F.3d at 769-72 (reversing and remanding where the lower court did not complete the efficient enforcer analysis). As a result of the court's errors, there is, at present, no private party able to hold Appellees responsible for their price-fixing conspiracy against DIRECTV—and no way for DIRECTV to seek redress for its injuries. This Court should reverse the dismissal of DIRECTV's claims so that the antitrust laws can be enforced and DIRECTV's injuries redressed.

47

## CONCLUSION

For all of these reasons, the Court should reverse and remand the decision below, holding that DIRECTV has antitrust standing.

Amanda Shafer Berman
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, DC 20004
(202) 624-2500
aberman@crowell.com

Jordan L. Ludwig
CROWELL & MORING LLP
515 South Flower Street
Los Angeles, CA 90071
(213) 622-4750
jludwig@crowell.com

/s/ Olivier N. Antoine
Olivier N. Antoine
Jared Levine
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 223-4000
oantoine@crowell.com
jlevine@crowell.com

Dated: July 2, 2024

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that this brief:

(i) complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,327 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century.


Dated: July 2, 2024          /s/ Olivier N. Antoine
                             Olivier N. Antoine

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2024, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Second Circuit by using the CM/ECF system. I certify that all the participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Olivier N. Antoine
Olivier N. Antoine