# No. 24-981

In The

# United States Court of Appeals
# for the Second Circuit

DIRECTV, LLC,
*Plaintiff-Appellant*,

v.

NEXSTAR MEDIA GROUP, INC., MISSION BROADCASTING, INC., AND WHITE KNIGHT BROADCASTING, INC.,
*Defendants-Appellees.*

On Appeal from the
United States District Court for the Southern District of New York
Honorable P. Kevin Castel
No. 23-CV-2221

## BRIEF FOR THE UNITED STATES OF AMERICA AS AMICUS CURIAE IN SUPPORT OF NEITHER PARTY

JONATHAN S. KANTER
    *Assistant Attorney General*
DOHA G. MEKKI
    *Principal Deputy Assistant Attorney General*
JOHN W. ELIAS
    *Deputy Assistant Attorney General*
DAVID B. LAWRENCE
    *Policy Director*
ALICE A. WANG
    *Counsel to the Assistant Attorney General*

JOHN J. SULLIVAN
DANIEL E. HAAR
NICKOLAI G. LEVIN
ANDREW N. DELANEY
    *Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., NW
Washington, DC 20530-0001
(202) 514-2414
andrew.delaney@usdoj.gov

*Counsel for the United States*

# TABLE OF CONTENTS

Page

INTEREST OF THE UNITED STATES ................................................... 1

STATEMENT OF THE ISSUE ............................................................... 2

BACKGROUND ................................................................................... 2

ARGUMENT ........................................................................................ 6

THE DISTRICT COURT'S IMPROPER UNDERSTANDING OF THE
HARMS FROM PRICE FIXING LED IT TO ERR IN ITS
ANTITRUST-STANDING ANALYSIS ................................................... 8

    A.    Price-Fixing Conspiracies Harm the Competitive Process and
Can Result in Many Different Types of Consumer Harm .............. 11

    B.    The District Court's Misunderstanding of the Full Scope of
Anticompetitive Harms from Price Fixing Infected Its Antitrust-
Standing Analysis. ....................................................................... 18

        1. Antitrust Injury ...................................................................... 18

        2. Efficient Enforcer ................................................................... 21

CONCLUSION ................................................................................... 23

i

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arizona v. Maricopa County Medical Society,*
457 U.S. 332 (1982) ........................................................................12, 15

*Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ..............................10

*Atlanta Richfield Co. v. USA Petroleum Co.,*
495 U.S. 328 (1990) .................................................................................9

*Blue Shield of Virginia v. McCready,*
457 U.S. 465 (1982) ...............................................................................19

*Broadcast Music, Inc. v. CBS, Inc.,*
441 U.S. 1 (1979) ..............................................................................6, 13

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
429 U.S. 477 (1977) .................................................................................9

*California Dental Association v. FTC,*
526 U.S. 756 (1999) ...............................................................................14

*Catalano, Inc. v. Target Sales, Inc.,*
446 U.S. 643 (1980)..........................................................................11, 12

*City of Oakland v. Oakland Raiders,*
20 F.4th 441 (9th Cir. 2021) ......................................................19, 20, 22

*Copperweld Corp. v. Independence Tube Corp.,*
467 U.S. 752 (1984) ...............................................................................13

*DNAML Party, Limited v. Apple Inc.,*
25 F. Supp. 3d 422 (S.D.N.Y. 2014)......................................................17

*Faber v. Metro. Life Ins. Co.,*
648 F.3d 98 (2d Cir. 2011). .....................................................................2

*Freedom Holdings, Inc. v. Spitzer*,
    357 F.3d 205 (2d Cir. 2004) ............................................................... 15

*FTC v. Indiana Federation of Dentists*,
    476 U.S. 447, (1986) ........................................................................ 11

*Gatt Communications, Inc. v. PMC Associates, L.L.C.*,
    711 F.3d 68 (2d Cir 2013) ........................................................ 16, 17

*Gelboim v. Bank of America Corp.*,
    823 F.3d 759 (2d. Cir. 2016) ................................................... passim

*General Leaseways, Inc. v. National Truck Leasing Association*,
    744 F.2d 588 (7th Cir. 1984) ........................................................... 14

*Grappone, Inc. v. Subaru of New England*,
    858 F.2d 792 (1st Cir. 1988) ........................................................... 14

*In re Aluminum Warehousing Antitrust Litigation*,
    833 F.3d 151 (2d Cir. 2016) .......................................................... 8, 9

*In re High Fructose Corn Syrup Antitrust Litigation*,
    295 F.3d 651 (7th Cir. 2002) ........................................................... 13

*In re Pandora Media, LLC Copyright Litigation*, No. 2:22-cv-00809,
    2022 U.S. Dist. LEXIS 198694 (C.D. Cal. Oct. 26, 2022) .................... 20

*Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*,
    340 U.S. 211 (1951) ........................................................................ 13

*Major League Baseball Properties, Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008) ........................................................... 14

*Montreal Trading, Ltd. v. Amax, Inc.*,
    661 F.2d 864 (10th Cir. 1981) ................................................... 20, 22

*Morrison v. Murray Biscuit Co.*,
    797 F.2d 1430 (7th Cir. 1986) ......................................................... 13

*Nastasi & Associates v. Bloomberg, L.P.*, No. 20-cv-5428,
    2022 U.S. Dist. LEXIS 172854 (S.D.N.Y. Sept. 23, 2022) ................. 17

iii

*National Society of Professional Engineers v. United States*,
435 U.S. 679 (1978) ........................................................................ 7, 15

*NCAA v. Board Of Regents of the University of Oklahoma*,
468 U.S. 85 (1984) .............................................................................. 7

*New York v. Hendrickson Brothers, Inc.*,
840 F.2d 1065 (2d Cir. 1988) ............................................................ 14

*North Carolina State Board Of Dental Examiners v. FTC*,
574 U.S. 494 (2015) ....................................................................... 7, 13

*Northern Pacific Railway Co. v. United States*,
356 U.S. 1 (1958) ............................................................................... 15

*NYNEX Corp. v. Discon, Inc.*,
525 U.S. 128 (1998) ........................................................................... 13

*Ohio v. American Express Co.*,
138 S. Ct. 2274 (2018) ................................................................. 11, 15

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*,
507 F.3d 117 (2d Cir. 2007) ......................................................... 17, 18

*Standard Oil Co. v. United States*,
221 U.S. 1 (1911) ............................................................................... 11

*The PLS.com, LLC v. National Association of Realtors*,
32 F.4th 824 (9th Cir. 2022) ............................................................... 8

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001) ............................................................ 7, 8

*United States v. Aiyer*,
33 F.4th 97 (2d Cir. 2022) .............................................................. 6, 11

*United States v. Andreas*,
39 F. Supp. 2d 1048 (N.D. Ill. 1998) ................................................. 14

*United States v. Koppers Co.*,
652 F.2d 290 (2d Cir. 1981) ............................................................... 11

iv

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940) ....................................................................7, 12, 13

*United States v. Trenton Potteries Co.*,
  273 U.S. 392 (1927) ...........................................................................12

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko*,
  540 U.S. 398 (2008) ..............................................................................6

*Yong Ki Hong v. KBS America, Inc.*,
  951 F. Supp. 2d 402 (E.D.N.Y. 2013) ...........................................16, 17

**Statutes**

15 U.S.C. § 1 ........................................................................................4, 11

**Other Authorities**

Jonathan Kanter, *Remarks as Prepared for Delivery at the 2023
  Georgetown Antitrust Law Symposium* (Sept. 19, 2023),
  https://justice.gov/opa/speech/assistant-attorney-general-jonathan-
  kanter-delivers-remarks-2023-georgetown-antitrust ...........................4

**Rules**

Federal Rule of Appellate Procedure 29(a). .............................................2

## INTEREST OF THE UNITED STATES

The United States enforces the federal antitrust laws, including Section 1 of the Sherman Act, and has a strong interest in their correct application. The United States takes no position on the ultimate merits of the claim at issue but urges this Court to correct the district court's erroneous holding in its antitrust-standing analysis that the sole type of injury for which a private consumer plaintiff can recover in a price-fixing case is the payment of supracompetitive prices. The harms from a price-fixing conspiracy are not so limited. Price fixing corrupts the competitive process, and that anticompetitive harm can result in various antitrust injuries, such as reduced output and decreased quality, in addition to increased prices.

In federal enforcement actions, the United States must only demonstrate the existence of a price-fixing conspiracy among actual or potential competitors to establish an unreasonable restraint of trade under Section 1 of the Sherman Act. But a private plaintiff seeking to challenge a price-fixing conspiracy must additionally establish antitrust standing to bring a case. The United States has a significant interest in ensuring that the scope of the anticompetitive impact of price-fixing is

1

properly understood, and that private enforcement, which can be an important adjunct to government enforcement, is not unduly cabined.[1] We file this amicus brief under Federal Rule of Appellate Procedure 29(a).

## STATEMENT OF THE ISSUE

Whether the district court erred in its antitrust-standing analysis by holding that overpayments are the only type of injury that can serve as the basis for a consumer's challenge to a price-fixing conspiracy.

## BACKGROUND

DirecTV LLC (DirecTV) sells subscription television programming packages to consumers. Dist. Ct. Dkt. 1 (Complaint) ¶ 3.[2] Like other subscription television services, DirecTV negotiates with programmers, including broadcast television stations, to license (for a fee) the right to

---

[1] The United States has filed amicus briefs addressing antitrust standing. *See, e.g.*, Brief for the United States of America as Amicus Curiae in Support of Neither Party, *The PLS.com, LLC v. National Association of Realtors*, 32 F.4th 824 (9th Cir. 2022), at https://www.justice.gov/atr/case-document/file/1400951/dl?inline; *Ellis v. Salt River Project*, 24 F.4th 1262 (9th Cir. 2022), at https://www.justice.gov/atr/case-document/file/1292891/dl?inline.
[2] The facts set forth in this brief are based on the allegations in the complaint, which are taken as true on a motion to dismiss. *See, e.g., Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 102 (2d Cir. 2011).

2

transmit their channels to its subscribers. *Id.* ¶¶ 3-4. Due to the popularity of broadcast television stations—particularly those affiliated with a "Big-4" network (ABC, CBS, Fox, NBC)—if DirecTV fails to negotiate a license agreement for a broadcast station, then its programming offerings are diminished, and it risks losing subscribers. *Id.* ¶¶ 1, 37, 60-63.

Broadcast television networks transmit programming via local stations. Complaint ¶ 36. In any given locality (generally referred to as a designated metropolitan area or DMA), a Big-4 network station can be owned either by the network itself or by third-party owners. *Id.* ¶ 37. FCC rules generally prohibit the owning, operating, or controlling of multiple Big-4 network stations in any DMA. *Id.* ¶ 5.[3] If a broadcast station group owner seeks to acquire a second Big-4 network station in a DMA (for instance, when acquiring stations across multiple DMAs), then it generally must divest one of the overlapping Big-4 network stations. *Id.* The divested broadcast stations are often spun off to

---

[3] The FCC generally prohibits the common ownership of two of the four top-rated stations by audience share in a DMA under its "Duopoly Rule." Complaint ¶ 5. Usually, though not always, those are the Big-4 network stations in the DMA. *See id.*

"sidecar" owners who, per regulation, are prohibited from coordinating with the primary station owner on licensing negotiations (due to the competition concerns mandating the divestiture). *Id.* ¶¶ 5-7.

Nexstar Media Group Inc. (Nexstar) is the largest third-party station owner in the country, and Mission Broadcasting, Inc. (Mission), and White Knight Broadcasting, Inc. (White Knight) are its sidecars. *Id.* ¶¶ 7, 31-33. Each own Big-4 network stations in multiple overlapping DMAs. *Id.* ¶¶ 31-33.

DirecTV (Plaintiff) sued Nexstar, Mission, and White Knight (collectively, Defendants), claiming, among other things, that they conspired to fix prices in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *Id.* ¶¶ 1, 152-58.[4] DirecTV alleged that it did not renew its respective license agreements with Mission and White Knight because it declined to pay their supracompetitive licensing fees resulting from

---

[4] While the United States takes no position on whether the allegations of Nexstar conspiring with its divestiture sidecars to fix prices will be proven, the Antitrust Division has expressed concern that divestitures "often fail to protect the harm to competition from an otherwise anticompetitive merger." *See* Jonathan Kanter, *Remarks as Prepared for Delivery at the 2023 Georgetown Antitrust Law Symposium* (Sept. 19, 2023), https://justice.gov/opa/speech/assistant-attorney-general-jonathan-kanter-delivers-remarks-2023-georgetown-antitrust.

the conspiracy. *Id.* ¶ 156. DirecTV therefore lost access to their broadcast stations, losing thousands of subscribers (and associated revenue). Dist. Ct. Dkt. 76 (Op.) at 5; Complaint ¶¶ 2, 190, 202. DirecTV sought an injunction prohibiting Defendants from colluding in negotiations, as well as monetary damages for the lost subscriber revenue. Complaint at p. 50.

The district court dismissed the complaint for failure to plead antitrust standing. *See* Op. 9-15. The court concluded that Plaintiff satisfied neither necessary element of antitrust standing because Plaintiff failed to allege (1) it had suffered antitrust injury; or (2) that it was an efficient enforcer of the violation. *Id.* In its antitrust-injury analysis, the court held that price-fixing can cause anticompetitive harm only through the "payment of supracompetitive prices." *Id.* at 10-12. The court then reasoned that because DirecTV never accepted the supracompetitive price offered, and accordingly never made supracompetitive payments, it had failed to adequately allege antitrust injury. *Id.* The court further held that, as a non-purchaser suffering only an "indirect" injury, DirecTV had failed to allege that it would be an efficient enforcer. *Id.* at 13-15.

5

## ARGUMENT

Price-fixing conspiracies among actual or potential competitors are one of the "supreme evil[s] of antitrust." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2008). "[C]ompetitive pricing [is] the free market's means of allocating resources," *Broadcast Music, Inc. v. CBS, Inc*., 441 U.S. 1, 23 (1979), and thus price-fixing agreements among actual or potential competitors are per se illegal, *Gelboim v. Bank of Am. Corp*., 823 F.3d 759, 774 (2d Cir. 2016)—i.e., prohibited "categorically" because of their "inherently anticompetitive nature," *United States v. Aiyer*, 33 F.4th 97, 114 (2d Cir. 2022).

Here, the district court did not question that the alleged price-fixing conspiracy would be per se unlawful if it existed. But, as part of its antitrust-standing analysis, it improperly limited who may sue over this alleged violation based on its incorrect holding that "the payment of supracompetitive prices" is the only form of redressable injury for a consumer challenging a price-fixing agreement in a private case. Op. 10-12.

6

Price-fixing agreements can cause many different types of anticompetitive effects. Primarily, price fixing "undermine[s] the free market," *N.C. State Bd. Of Dental Exam'rs v. FTC*, 574 U.S. 494, 502 (2015), and "reduc[es] the importance of consumer preference in setting price and output," *NCAA v. Bd. Of Regents of the Univ. of Okla.*, 468 U.S. 85, 107 (1984). Price fixing therefore fundamentally undermines the competitive process, causing a breakdown in the "central nervous system of the economy." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.) (referring to *Socony-Vacuum* as the "seminal" decision prohibiting price fixing). Moreover, while the results of corrupting the competitive process are often unpredictable, price-fixing agreements frequently result in identifiable injuries to consumers, including—but not limited to—inflated prices, reduced output, less innovation, and diminished "quality, service, safety, and durability." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978).[5]

---

[5] Consumer harm includes not just harm to end consumers but also harm to other market participants, such as intermediate purchasers.

7

The district court's unduly narrow understanding of the injuries that can result from price-fixing agreements led its antitrust-standing analysis astray. This Court should correct that legal error not only to apply the law properly in this case, but also to ensure that the universe of private plaintiffs that may seek redress for their injuries from price-fixing conspiracies is not unduly limited.

## THE DISTRICT COURT'S IMPROPER UNDERSTANDING OF THE HARMS FROM PRICE FIXING LED IT TO ERR IN ITS ANTITRUST-STANDING ANALYSIS

In addition to demonstrating that conduct was anticompetitive in violation of the Sherman Act, a private plaintiff claiming a violation must also establish that it has "antitrust standing." *See, e.g., In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016). To establish antitrust standing, this Court requires a private plaintiff to show both that (1) it has suffered "antitrust injury," and that

---

*See The PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 832 (9th Cir. 2022) ("[A] business that uses a product as an input to create another product or service is a consumer of that input for antitrust purposes and can allege antitrust injury."). And because considerations such as these must be "*reversed* in the context of a buyer-side conspiracy," *Todd*, 275 F.3d at 202 (emphasis in original), in such cases the relevant consideration is seller harm, such as harm to workers.

(2) it is an "efficient enforcer of the antitrust laws." *Id*. at 157-58 (quotation marks omitted).

"Antitrust injury" refers to an injury that is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Requiring antitrust injury "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990). For example, in *Brunswick*, plaintiffs alleged damages from lost profits they suffered from a firm's acquisitions that allowed rival businesses to stay in the market rather than close. 429 U.S. at 488. The Supreme Court held that plaintiffs could not recover for "the profits they would have realized had competition been reduced" in the absence of challenged acquisitions. *Id.* Even if plaintiffs' claimed injury (lower profits) was caused by the acquisitions, it did not occur by virtue of a reduction of competition—that is, "by reason of that which made the acquisitions unlawful." *Id*. (quotation marks omitted).

9

In addition to antitrust injury, a plaintiff must "satisfy the efficient enforcer factors." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 777 (2d Cir. 2016). This Court considers: "(1) the 'directness or indirectness of the asserted injury'. . . ; (2) the 'existence of more direct victims of the alleged conspiracy'; (3) the extent to which [plaintiffs'] damages claim is 'highly speculative'; and (4) the importance of avoiding 'either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.'" *Id.* at 778 (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 540-45 (1983)).

The district court correctly recited these antitrust-standing principles, *see* Op. 9-10, 13, but erred in applying them. It misunderstood the types of injuries that can flow from the anticompetitive nature and character of price-fixing conspiracies. As explained below, price-fixing conspiracies corrupt the competitive process, and that corruption can result in multiple anticompetitive effects—not just the payment of supracompetitive prices. These effects can, in certain instances, result in antitrust injury and antitrust standing for non-purchasers. Remand is appropriate for the district

10

court to consider application of the antitrust-standing requirements on a full and proper understanding of the harms caused by price-fixing conspiracies.

## A. Price-Fixing Conspiracies Harm the Competitive Process and Can Result in Many Different Types of Consumer Harm

1. "[A]n agreement to fix prices is unlawful *per se*" under Section 1 of the Sherman Act. *Catalano, Inc. v. Target Sales, Inc*., 446 U.S. 643, 647 (1980).[6] Price-fixing agreements among actual or potential competitors are "categorically unreasonable, such that proof of reasonableness . . . is not required." *Aiyer*, 33 F.4th at 123. Rather, to establish liability, it is enough to prove that a price-fixing agreement among actual or potential competitors exists (in or substantially affecting interstate commerce). *Id.* at 115; *see also United States v. Koppers Co*., 652 F.2d 290, 294-95 (2d Cir. 1981).

---

[6] Section 1 of the Sherman Act prohibits agreements that unreasonably restrain trade. 15 U.S.C. § 1; *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 457 (1986). "Restraints can be unreasonable in one of two ways." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018). First, the Sherman Act condemns certain restraints as per se unreasonable based on the restraints' inherently anticompetitive "nature and character." *Standard Oil Co. v. United States*, 221 U.S. 1, 64-65 (1911). Second, "[r]estraints that are not unreasonable *per se* are judged under the 'rule of reason.'" *Am. Express*, 138 S. Ct. at 2284.

11

Contrary to the district court's understanding, the Sherman Act's categorical prohibition on price-fixing agreements is "grounded on faith in price competition as a market force and not on a policy of low selling prices." *Ariz. v. Maricopa Cnty. Medical Soc.*, 457 U.S. 332, 348 (1982) (alterations omitted). Similarly, this Court has recognized that Section 1 proscribes price-fixing conspiracies because they are an "influence[] that corrupt[s] market conditions," not because they necessarily result in an elevated price level. *Gelboim*, 823 F.3d at 773-74 (citing *Socony-Vacuum*, 310 U.S. at 219-21, 224 n.59).

Congress has prohibited price-fixing agreements regardless of the level at which the prices are fixed. The prohibition applies broadly to agreements among actual or potential competitors "raising, depressing, fixing, pegging, or stabilizing" prices. *Socony-Vacuum*, 310 U.S. at 223. "It is no excuse" to a price-fixing agreement "that the prices fixed are themselves reasonable." *Catalano*, 446 U.S. at 647; *see also Socony-Vacuum*, 310 U.S. at 221; *United States v. Trenton Potteries Co.*, 273 U.S. 392, 397-98 (1927). Nor can competitors agree to set a maximum price, *Maricopa*, 457 U.S. at 348, or fix prices with some flexibility for future deviations, *see Gelboim*, 823 F.3d at 776 ("An agreement to fix

12

list prices is . . . a per se violation of the Sherman Act even if most or for that matter all transactions occur at lower prices.") (alterations in original) (*quoting In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002) (Posner, J.)).

That is, Section 1 categorically prohibits price-fixing agreements among actual or potential competitors—regardless of the prices charged—because such agreements "directly interfer[e] with the free play of market forces," *Socony-Vacuum*, 310 U.S. at 221; they are thus "anathema to an economy predicated on the undisturbed interaction between supply and demand," *Gelboim*, 823 F.3d at 774; *see also N.C. State Bd.*, 574 U.S. at 502; *Broadcast Music*, 441 U.S. at 23; *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211, 213 (1951) (Price-fixing conspiracies "cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment."), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984). These conspiracies are thus a type of conduct that harms the "competitive process, *i.e.*, [] competition itself," *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998), the protection of which is "[t]he purpose of antitrust law," *Morrison v. Murray Biscuit Co.*, 797 F.2d

13

1430, 1437 (7th Cir. 1986) (Posner, J.); *see also Grappone, Inc. v. Subaru of New England*, 858 F.2d 792, 794 (1st Cir. 1988) (Breyer, J.) ("[T]he antitrust laws exist to protect the competitive process itself.").

2. Price-fixing agreements not only harm the competitive process but also can cause many different types of consumer harm. Increased prices is one such harm, but there are others.[7] For example—and specifically relevant to the district court's holding—"basic principles of economics" predict that reduced output can result from fixing high prices, as "output will decline as fewer consumers are willing to purchase [the price-fixed] goods at higher prices." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 336 n.3 (2d Cir. 2008) (Sotomayor, J. concurring); *see also Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 777 (1999) (Often where "firms raise price [through a price-fixing conspiracy], the market's demand for their product will fall, so the amount supplied will fall too—in other words, output will be restricted.") (quoting *General Leaseways, Inc. v. National Truck Leasing Ass'n*, 744 F.2d 588, 594 (7th Cir. 1984) (Posner, J.)); *United States v.*

---

[7] Even prices that stay the same may be increased compared to the price level but for the price-fixing conspiracy. *See New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1077 (2d Cir. 1988).

14

*Andreas*, 39 F. Supp. 2d 1048, 1060 (N.D. Ill. 1998) ("Direct price agreements and sales volume are two sides to the same price-fixing coin.") (quoted by *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 225 (2d Cir. 2004)). Such reduced output is also an anticompetitive effect from price fixing. *See, e.g., Ohio v. Am. Express Co.,* 138 S. Ct. 2274, 2284 (2018).

Furthermore, price-fixing conspiracies can cause consumer injury irrespective of their effect on prices. By depriving consumers of the "free opportunity to select among alternative offers," price fixing can also harm consumers through diminished "quality, service, safety, and durability." *Professional Engineers*, 435 U.S. at 695; *see also Maricopa*, 457 U.S. at 348 (price fixing might "deter experimentation and new developments by individual entrepreneurs"); *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958) ("[T]he unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress.").

3. In holding that price fixing's *sole* anticompetitive effect was the payment of increased prices, the district court relied principally on this

15

Court's decision in *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68 (2d Cir 2013). The court interpreted *Gatt* as standing for the proposition that price-fixing agreements are illegal "only because of the harm they [horizontal price-fixing schemes] may cause—increased prices—to *purchasers*." Op. 10-11 (emphasis in original) (quoting *Yong Ki Hong v. KBS Am., Inc*., 951 F. Supp. 2d 402, 418 (E.D.N.Y. 2013), quoting in turn *Gatt*, 711 F.3d at 77.)

While the quotation is accurate, the full context of the opinion makes clear that *Gatt* was not—in contravention of the precedent cited above, *see supra* pp. 11-15—purporting to limit the effects of every price-fixing conspiracy to the payment of increased prices. To the contrary, it was simply explaining what would have been a redressable injury from the price fixing at issue in that case (increased prices for purchasers), in contrast with the non-cognizable harm alleged (a co-conspirator's being cut out of the conspiracy).

In *Gatt*, the plaintiff was a former conspirator in an alleged bid-rigging and price-fixing scheme, and it brought an antitrust claim against its former co-conspirators after being cut out of the arrangement. 711 F.3d at 72-74. This Court concluded that there was

16

no antitrust injury because the antitrust "laws are not concerned with injuries . . . resulting from [competitors'] participation or exile from [price-fixing] schemes." *Id*. at 77. In that context, the *Gatt* decision's brief reference to harm to purchasers *from the price-fixing at issue* did not endeavor to catalogue exhaustively every recoverable injury from all price-fixing conspiracies in private cases. Other courts have interpreted *Gatt* consistent with that understanding. *See Nastasi & Assocs. v. Bloomberg, L.P.*, No. 20-cv-5428, 2022 U.S. Dist. LEXIS 172854, *28 (S.D.N.Y. Sept. 23, 2022) ("[T]he Court [in *Gatt*] did not hold more generally that the customer of a bid-rigging conspiracy is the only party that may sustain an antitrust injury."); *DNAML Pty, Ltd. v. Apple Inc*., 25 F. Supp. 3d 422, 429 (S.D.N.Y. 2014) ("*Gatt* does not stand for the broad proposition that a distributor's lost profits from a manufacturer's price-fixing conspiracy do not constitute antitrust injury.").[8]

Beyond *Gatt*, the district court cited *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc*., 507 F.3d 117 (2d Cir. 2007), for the

---

[8] Like *Gatt*—and unlike the allegations here— *Yong Ki Hong*, 951 F. Supp. 2d at 416-18, involved a terminated distributor who declined to participate in an alleged price-fixing scheme at the distribution level, and not (as alleged here) a distributor that declined to purchase price-fixed goods.

proposition that the anticompetitive effect of price fixing is limited to "the extraction of supracompetitive prices." *See* Op. 11. But *Port Dock* does not hold the effects of price fixing are so limited either. In fact, *Port Dock* was not a price-fixing case at all, but rather involved a terminated distributor challenging a manufacturer's allegedly acquiring rival firms to become a monopolist in violation of Section 7 of the Clayton Act and Section 2 of the Sherman Act. 507 F.3d at 123. This Court explicitly limited its conclusions to the circumstances of when terminated distributors may seek damages under those statutory provisions, *id.* at 123, and did not address a price-fixing conspiracy—as alleged here.

## B.   The District Court's Misunderstanding of the Full Scope of Anticompetitive Harms from Price Fixing Infected Its Antitrust-Standing Analysis.

The district court's unduly narrow understanding of the potential anticompetitive effects from price-fixing conspiracies affected its analysis of both elements of antitrust standing.

### 1. *Antitrust Injury*

First, the district court concluded that DirecTV could not satisfy the antitrust-injury prong because it did not pay the supracompetitive

18

licensing rates the conspirators allegedly demanded.  Op. 10-12.  In reaching that conclusion, the district court failed to consider whether DirectTV adequately alleged that it suffered other anticompetitive effects from the price-fixing conspiracy.  Specifically, DirecTV alleged that it was offered contract renewals (having previously reached agreements before the conspiracy) only at price-fixed, supracompetitive prices, which it declined.  Complaint ¶¶ 2, 156.  That output reduction results from the alleged price-fixing, *see supra* pp. 14-15, and that can constitute antitrust injury in this context because "while an increase in price resulting from a dampening of competitive market forces is assuredly one type of [antitrust] injury . . . that is not the only form of injury remediable under [Section 4 of the Clayton Act]."  *Blue Shield of Va. v. McCready*, 457 U.S. 465, 482-33 (1982); *see also Gelboim*, 823 F.3d at 774 (quoting *McCready* to this effect in a price-fixing case).

Other courts have recognized that non-purchasers may be able to demonstrate antitrust injury from price fixing despite their not paying the higher prices.  *See, e.g.*, *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 457-58 (9th Cir. 2021) (holding non-purchaser plaintiff had alleged antitrust injury since it "allege[d] that it was injured because

19

Defendants reduced output and increased prices . . . [which are] precisely the kinds of harms to competition that the antitrust laws were intended to prevent");[9] *In re Pandora Media, LLC Copyright Litig.*, No. 2:22-cv-00809, 2022 U.S. Dist. LEXIS 198694, *19 (C.D. Cal. Oct. 26, 2022) (holding that where a plaintiff "is faced with the choice of acquiescing to a supracompetitive" price or losing access to a product, that plaintiff "does not need to accept [defendants' allegedly supracompetitive] offer to demonstrate antitrust injury"); *cf. Montreal Trading, Ltd. v. Amax, Inc.*, 661 F.2d 864, 867-68 (10th Cir. 1981) (explaining that while price-fixing conspiracies more directly injure purchasers, they "may also injure nonpurchasers" and that "[w]hen the nonpurchaser can show a regular course of dealing with the conspirators, [antitrust] injury may not be inherently speculative"). A blanket prohibition on non-purchaser antitrust injury also would be contrary to sound antitrust policy, as it may leave without remedy

---

[9] In *City of Oakland*, the court ultimately concluded that the plaintiff, despite having suffered antitrust injury, lacked antitrust standing because it was not an efficient enforcer. 20 F.4th at 458-61. The district court below cited *City of Oakland* in reaching its alternative holding that DirecTV is not an efficient enforcer of the antitrust violation, but did not address that decision's holding regarding antitrust injury. Op. 14; *see also infra* B.2.

20

plaintiffs who have alleged harm from "an anticompetitive tendency: the warping of market factors," *Gelboim*, 823 F.3d at 776, including those who lack the resources to purchase at inflated prices.

### 2. *Efficient Enforcer*

The district court concluded that DirecTV's injury was "too indirect and speculative" for it to be an efficient enforcer, Op. 14, but this conclusion also appeared to depend, at least in part, on its erroneous holding that the anticompetitive harm caused by price fixing is limited to supracompetitive payments, *see supra* pp. 11-18. Specifically, the district court relied on this holding to characterize the alleged injury as "indirect [because] DIRECTV did not pay higher prices," and "uncertain[]" as compared to any television provider who paid the supracompetitive prices. Op. 14-15.

While non-purchasers often may fail to satisfy the efficient-enforcer criteria, just because a plaintiff is a non-purchaser does not mean that its injuries are indirect or uncertain. Non-purchaser plaintiffs may be able to establish that they are efficient enforcers where they have a prior course of dealing with the conspirators, such that the potential for a purchase but for the conspiracy is not unduly

speculative. In *City of Oakland*, 20 F.4th at 457-61, for instance, the court of appeals did not view non-purchaser status as a categorical bar. Rather, it concluded that the non-purchaser plaintiff was not an efficient enforcer only after determining the plaintiff's past dealings with the alleged conspirators were not sufficient to establish a "regular course of dealing." *See id.*; *see also Montreal Trading*, 661 F.2d at 867-68 (discussing the importance of a regular course of dealing for non-purchaser antitrust standing).

Whether a non-purchaser qualifies as an efficient enforcer may also depend on the relief sought and the nexus between the relief and the alleged conspiracy. Here, for instance, DirectTV has sought both damages based on lost subscriber revenue, as well as injunctive relief preventing Defendants from conspiring on their future negotiations with DirecTV. *See* Complaint at p. 50. Even if the district court were correct that DirectTV's damages for lost subscribers were too indirect and speculative, Op. 13-15; *cf. Gelboim*, 823 F.3d at 779 ("highly speculative damages is a sign that a given plaintiff is an inefficient engine of enforcement"), that would not necessarily be the case for a potential injunction.

22

## CONCLUSION

Remand is appropriate to allow the district court to address antitrust standing with a full and proper understanding of the types of injuries caused by price-fixing conspiracies. This Court should vacate and remand the decision below.

Respectfully submitted.

s/ Andrew DeLaney

JONATHAN S. KANTER
  *Assistant Attorney General*

DOHA G. MEKKI
  *Principal Deputy Assistant*
  *Attorney General*

JOHN W. ELIAS
  *Deputy Assistant Attorney General*

DAVID B. LAWRENCE
  *Policy Director*

ALICE A. WANG
  *Counsel to the Assistant Attorney*
  *General*

JOHN J. SULLIVAN
DANIEL E. HAAR
NICKOLAI G. LEVIN
ANDREW N. DELANEY
  *Attorneys*
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., N.W.
Room 3224
Washington, D.C. 20530-0001
(202) 514-2414
andrew.delaney@usdoj.gov
  *Counsel for the United States*

July 23, 2024

24

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) and Circuit Rule 29.1(c) because, excluding the parts exempted by Fed. R. App. P. 32(f), the brief contains 4,445 words.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in Microsoft Word, using 14-point New Century Schoolbook font, a proportionally spaced typeface.


s/ Andrew DeLaney
ANDREW N. DELANEY
*Counsel for the United States*

## CERTIFICATE OF SERVICE

I certify that on July 23, 2024, I caused the foregoing to be filed through this Court's ACMS system, which will serve a notice of electronic filing on all registered users.

s/ Andrew DeLaney
ANDREW N. DELANEY
*Counsel for the United States*