# 24-0981-cv

# United States Court of Appeals

*for the*

# Second Circuit

———————————————

DIRECTV, LLC,

*Plaintiff-Appellant,*

— v. —

NEXSTAR MEDIA GROUP, INC., MISSION BROADCASTING, INC.,
WHITE KNIGHT BROADCASTING, INC.,

*Defendants-Appellees.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PROOF BRIEF FOR DEFENDANTS-APPELLEES

LAUREN WILLARD ZEHMER
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
lzehmer@cov.com

*Attorneys for Defendant-Appellee
 Nexstar Media Group, Inc.*

STEPHEN J. OBERMEIER
FRANK SCADUTO
ENBAR TOLEDANO
MICHAEL J. SHOWALTER
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000
sobermeier@wiley.law
fscaduto@wiley.law
etoledano@wiley.law
mshowalter@wiley.law

*Attorneys for Defendant-Appellee
 Mission Broadcasting, Inc.*

*(For Continuation of Appearances See Inside Cover)*

CP COUNSEL PRESS    (800) 4-APPEAL • (332117)

DAVID W. HALLER
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, New York 10018
(212) 841-1000
dhaller@cov.com

– and –

CHRIS SCHWEGMANN
LYNN PINKER HURST
   & SCHWEGMANN LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800
cjs@lynnllp.com

*Attorneys for Defendant-Appellee*
   *Nexstar Media Group, Inc.*

KAN M. NAWADAY
VENABLE LLP
151 West 42nd Street
New York, New York 10036
(212) 307-5500
kmnawaday@venable.com

– and –

CRAIG A. GILLEY
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, DC 20001
(202) 344-4000
cagilley@venable.com

– and –

ELIZABETH C. RINEHART
VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 244-7400
ecrinehart@venable.com

*Attorneys for Defendant-Appellee*
   *White Knight Broadcasting, Inc.*

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendants-Appellees make the following disclosures:

The undersigned counsel for Defendant-Appellee Nexstar Media Group, Inc. certifies that Nexstar Media Group, Inc. is a publicly held corporation. Nexstar Media Group, Inc. does not have a parent corporation, and no publicly held corporation owns 10% or more of its stock.

The undersigned counsel for Defendant-Appellee Mission Broadcasting, Inc. certifies that Mission Broadcasting, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

The undersigned counsel for Defendant-Appellee White Knight Broadcasting, Inc. certifies that White Knight Broadcasting, Inc. is a Delaware corporation and is a wholly owned subsidiary of White Knight Holdings, Inc. There is no publicly held corporation that owns 10% or more of White Knight Broadcasting, Inc.

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT.................................................................. i

TABLE OF AUTHORITIES ...................................................................... iv

INTRODUCTION ................................................................................1

ISSUES PRESENTED..........................................................................5

STATEMENT OF THE CASE..................................................................6

    A.  The Market For Retransmission Of Television Broadcast Programming........6

    B.  DIRECTV's Failed Retransmission Renewal Negotiations...........................7

    C.  Procedural History ......................................................................8

SUMMARY OF ARGUMENT ...............................................................11

ARGUMENT ..................................................................................15

I.   DIRECTV Lacks Article III Standing. ...............................................15

    A.      DIRECTV Failed To Adequately Plead Traceability .........................15

         1.      DIRECTV Relies On A Speculative Chain Of Possibilities ....18

         2.      DIRECTV Alleges Only Attenuated Causal Links .................21

    B.      DIRECTV's Request For Injunctive Relief Fails For Additional Reasons................................................................................22

         1.      DIRECTV Did Not Adequately Plead Redressability..............22

         2.      DIRECTV Did Not Allege A Real And Immediate Threat Of Future Injury .......................................................................23

II.  DIRECTV Lacks Antitrust Standing. ................................................26

    A.      DIRECTV Has Failed To Plead Antitrust Injury................................28

         1.      Nonpurchasers Typically Lack Antitrust Injury ......................29

2.  DIRECTV's Allegations Do Not Meaningfully Distinguish It From Other Nonpurchasers ......................................................35

3.  DIRECTV's Citations Highlight The Weakness Of Its Position ....................................................................................39

4.  Any Allegation That Appellees Targeted DIRECTV Does Not Confer Antitrust Injury ............................................................43

B.  DIRECTV Has Failed to Plead That It Is An Efficient Enforcer Of The Antitrust Laws. ......................................................................44

1.  DIRECTV's Alleged Injury Is Too Indirect. ............................47

2.  Under DIRECTV's Theory, More Direct Plaintiffs Would Exist. ..............................................................................................49

3.  DIRECTV's Damages Are Highly Speculative. .....................53

4.  There Is Substantial Risk Of Duplicative Recoveries Or Complex Apportionment. .........................................................58

CONCLUSION .........................................................................................59

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*7 W. 57th St. Realty Co. v. Citigroup, Inc.*,
771 F. App'x 498 (2d Cir. 2019) ..........................................................41, 48, 51

*ACLU v. DOJ*,
894 F.3d 490 (2d Cir. 2018) ...............................................................47

*Advo, Inc. v. Philadelphia Newspapers, Inc.*,
51 F.3d 1191 (3d Cir. 1995) ...............................................................52

*Allco Fin. Ltd. v. Klee*,
805 F.3d 89 (2d Cir. 2015) .................................................................15

*In re Aluminum Warehousing Antitrust Litig.*,
833 F.3d 151 (2d Cir. 2016) ...............................................................38, 39

*Am. Broad. Cos., Inc. v. Goodfriend*,
557 F. Supp. 3d 409 (S.D.N.Y. 2021) ................................................7

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
19 F.4th 127 (2d Cir. 2021) ................................................................46, 48, 49

*Amidax Trading Grp. v. S.W.I.F.T SCRL*,
671 F.3d 140 (2d Cir. 2011) ...............................................................16, 17, 18

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
256 F.3d 799 (D.C. Cir. 2001)............................................................39

*Apple Inc. v. Pepper*,
587 U.S. 273 (2019).............................................................................10, 29

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................17, 55

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of
Carpenters*,
459 U.S. 519 (1983).......................................................................*passim*

iv

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)..............................................................3, 28

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) .................................................21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..............................................................55

*Berni v. Barilla S.p.A.*,
964 F.3d 141 (2d Cir. 2020) .........................................25, 26

*Calcano v. Swarovski N. Am. Ltd.*,
36 F.4th 68 (2d Cir. 2022) ...................................16, 24, 25

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)..........................................................23, 24

*City of Oakland v. Oakland Raiders*,
20 F.4th 441 (9th Cir. 2021) ...........................36, 49, 53, 56

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)........................................................16, 18

*Conn. Parents Union v. Russell-Tucker*,
8 F.4th 167 (2d Cir. 2021) ...........................................16, 17

*Daniel v. Am. Bd. Of Emergency Med.*,
428 F.3d 408 (2d Cir. 2005) .......................46, 47, 51, 53

*Davis v. New York City Dep't of Educ.*,
804 F.3d 231 (2d Cir. 2015) ...............................................47

*In re DDAVP Direct Purchaser Antitrust Litigation*,
585 F.3d 677 (2d Cir. 2009) ........................................*passim*

*Dep't of Educ. v. Brown*,
600 U.S. 551 (2023)........................................................15, 23

*DNAML Pty, Ltd. v. Apple Inc.*,
25 F. Supp. 3d 422 (S.D.N.Y. 2014) ...........................36, 42

*Dorce v. City of New York*,
2 F.4th 82 (2d Cir. 2021) ....................................................................26

*Eastman Kodak Co. v. Henry Bath LLC*,
936 F.3d 86 (2d Cir. 2019) ................................................................27

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)..............................................17, 18, 22, 31

*Fisher v. Aurora Health Care, Inc.*,
558 F. App'x 653 (7th Cir. 2014) ......................................................50

*Flannery Associates LLC v. Barnes Family Ranch Associates, LLC*,
No. 2:23-cv-00927-TLN-AC, 2024 WL 1344663 (E.D. Cal. Mar.
29, 2024) ...............................................................................................57

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*,
711 F.3d 68 (2d Cir. 2013) ...............................................*passim*

*Gelboim v. Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016) ............................................*passim*

*Harry v. Total Gas & Power, Inc.*,
889 F.3d 104 (2d Cir. 2018) .......................................................16, 28

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
924 F.3d 57 (2d Cir. 2019) .................................................14, 27, 51

*Jennings v. Stephens*,
574 U.S. 271 (2015)...........................................................................47

*Kommer v. Bayer Consumer Health*,
710 F. App'x 43 (2d Cir. 2018) ........................................................25

*Laborers Loc. 17 Health & Benefit Fund v. Philip Morris, Inc.*,
191 F.3d 229 (2d Cir. 1999) ..............................................................44

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)......................................................................27, 41

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)...........................................................................20

*McCarthy v. Bank of Am.*,
No. 23-0619-CV, 2024 WL 2206794 (2d Cir. May 16, 2024)...........................35

*Mid-W. Paper Prods. Co. v. Cont'l Grp., Inc.*,
596 F.2d 573 (3d Cir. 1979) ................................................................27, 50, 58

*Montreal Trading Ltd. v. Amaxn Inc.*,
661 F.2d 864 (10th Cir. 1981) ........................................................38, 49, 51, 54

*Murthy v. Missouri*,
144 S.Ct. 1972 (2024)...................................................................17, 18, 19

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016) ..........................................................................25

*O'Shea v. Littleton*,
414 U.S. 488 (1974)......................................................................................23

*In re Pandora Media, LLC*,
No. 2:22-cv-00809, 2022 WL 19299126 (C.D. Cal. Oct. 26, 2022)............35, 57

*In re Platinum & Palladium Antitrust Litig.*,
61 F.4th 242 (2d Cir. 2023) ...............................................................*passim*

*Port Dock & Stone v. Oldcastle Ne.*,
507 F.3d 117 (2d Cir. 2007) ...............................................................*passim*

*In re Publ'n Paper Antitrust Litig.*,
690 F.3d 51 (2d Cir. 2012) .............................................................................35

*Rodriguez v. Vill. Green Realty, Inc.*,
788 F.3d 31 (2d Cir. 2015) .............................................................................15

*Rynasko v. NYU*,
63 F.4th 186 (2d Cir. 2023) ...........................................................................22

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
22 F.4th 103 (2d Cir. 2021) ...........................................................................48

*Shain v. Ellison*,
356 F.3d 211 (2d Cir. 2004) .....................................................................23, 26

*Simon v. E. Ky. Welfare Rts. Org.*,
426 U.S. 26 (1976)................................................................................20

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)............................................................................23

*United States v. Aiyer*,
33 F.4th 97 (2d Cir. 2022) ...............................................................34

*Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., LLC*,
455 F. App'x 102 (2d Cir. 2012) ......................................................55

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)............................................................................32

*Warth v. Seldin*,
422 U.S. 490 (1975)............................................................................18

## Other Authorities

IIA Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An
Analysis of Antitrust Principles and Their Application* (4th ed.
2014) ...................................................................................*passim*

*In re Customer Rebates for Undelivered Video Programming During
Blackouts*, Notice of Proposed Rulemaking, MB Docket No. 24-
20, FCC 24-2 (rel. Jan. 17, 2024) ........................................7, 20, 54

Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust
Law* (4th ed. 2011) .............................................................................52

# INTRODUCTION

This case involves an extraordinary theory of standing. DIRECTV, a non-competitor potential buyer of Appellees' products, alleges that Appellees fixed prices in order to extract supracompetitive rates. But unlike a typical buyer plaintiff, DIRECTV does not allege that it ever paid any supracompetitive rate. Indeed, DIRECTV does not allege that Appellees benefitted in any way from the alleged price-fixing agreement—in addition to no supracompetitive price being received, no competitor was driven from the market, and no market share was gained. Instead, DIRECTV contends that Appellees' alleged price-fixing *failed* because DIRECTV declined to make a purchase—but that DIRECTV was nevertheless injured and has standing to bring this case. That is wrong, both under Article III and, as the district court correctly determined, controlling precedent and fundamental tenets of antitrust law.

As a retailer of television content, DIRECTV purchases the rights to distribute television stations from broadcasters like Appellees, and then includes these stations in subscription plans that it sells to consumers. DIRECTV asserts that when it sought to purchase broadcast rights from Mission and White Knight in 2022, their asking prices were too high. So, DIRECTV chose to walk away from the bargaining table. Disappointed with the failed negotiations, DIRECTV now alleges that Mission's and White Knight's asking prices must have been fixed—which prompted its choice to

end the negotiations, which in turn terminated its access to Mission's and White Knight's television stations, which in turn led customers to end their DIRECTV subscriptions, which in turn impacted DIRECTV's profits. Those alleged lost profits are DIRECTV's sole alleged injury.

The problem for DIRECTV is that the actual payment of a supracompetitive price is ordinarily required to establish standing because, without it, the connection between the alleged price-fixing and a would-be buyer's supposed injury is too speculative and attenuated to establish causation. In the Supreme Court's seminal antitrust-standing case, *Associated General Contractors of Cal., Inc. v. California State Council of Carpenters*, the Court explained that Congress "did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." 459 U.S. 519, 534 (1983). Rather, Congress was "primarily interested" in creating a remedy for consumers who "pay excessive prices." *Id* at 530. While anticompetitive conduct may create "ripples of harm" that "flow through the Nation's economy," the Court explained, there must be "limits" on which of those allegedly harmed persons may sue. *Id.* at 534, 543.

Contrary to DIRECTV's strawman assertions, that does not require the Court to announce a bright-line rule that antitrust plaintiffs must always pay supracompetitive prices to plead antitrust standing in a horizontal price-fixing case. Indeed, as the district court recognized—and DIRECTV ignores—competitors

excluded from a market by other competitors' price-fixing may seek lost profits because the injury, in that context, flows directly from "that which makes [the conduct] unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).

But as the district court found, and DIRECTV itself recognizes, "DIRECTV is not a competitor of [Appellees]." D.Ct. 12, Dkt. No. 76 [JA___]; *see also* DIRECTV Br. 30. Rather, "DIRECTV 'is a buyer (*i.e.*, a consumer) in the retransmission consent market.'" D.Ct. 12 [JA___] (quoting DIRECTV's district-court brief). And a nonpurchaser—*i.e.*, a buyer who did not pay the supracompetitive prices an alleged price-fixing scheme was intended to extract—generally will have suffered only an attenuated and speculative injury. The injury is attenuated because a *buyer*'s lost profits do not benefit a seller, and thus are not price fixing's intended anticompetitive effects. And the injury is speculative because it depends on counterfactuals. Anyone can *say* they would have consummated a transaction but for allegedly fixed prices. But only a buyer that actually pays supracompetitive prices can demonstrate harm without relying on a speculative, attenuated causal chain of what *might* have happened in an alternative world. For these reasons, it is not surprising that DIRECTV is unable to cite a single case from this Circuit or any other circuit court concluding that an allegedly priced-out buyer had antitrust standing.

Even if in certain circumstances a buyer might be able to establish standing without paying alleged supracompetitive prices, those circumstances plainly do not exist here. As the district court recognized, DIRECTV's theory of causation involves too many speculative and attenuated steps to satisfy antitrust standing. DIRECTV argues that but for the alleged price-fixing, Mission and White Knight would not have proposed the prices they did. And but for the proposed prices, DIRECTV conjectures, Mission, White Knight, and DIRECTV would have reached agreement in their negotiations over broadcast rights. Then, DIRECTV continues, it could have offered Mission's and White Knight's stations in the subscription packages it offers consumers. Had it done that, DIRECTV speculates, fewer customers would have ended their subscriptions. The alleged lost profits from those allegedly lost subscribers, coming at the end of a multistep hypothetical causal chronicle, are the sole injury DIRECTV alleges.

These allegations do not even establish Article III standing. Indeed, the district court fully recognized that DIRECTV's speculative chain of causation posed Article III problems. But it found both traceability and redressability based on the mistaken belief that a plaintiff need only plead *possible* causation between alleged misconduct and injury rather than *plausible* causation. Multiple times in the last three years, this Court has confirmed that the standard is plausibility, which is a higher bar than possibility. DIRECTV cannot meet that standard.

But even if DIRECTV could satisfy Article III, the district court correctly concluded that DIRECTV lacks antitrust standing. Applying this Court's precedent, the court observed that allegedly priced-out buyers (*i.e.*, nonpurchasers who *say* they would have transacted but for allegedly supracompetitive prices) "typically" do not have antitrust standing. And it reasonably determined that, in this case, DIRECTV has relied on the very sort of "speculative chain of causation" that generally makes nonpurchasers unsuitable plaintiffs. Accordingly, the court dismissed the complaint on two independent grounds: (i) DIRECTV's lack of antitrust injury and (ii) a determination that DIRECTV is an inefficient enforcer of the antitrust laws. If this Court determines that it has jurisdiction (and it should not), it should affirm the district court on one or both of these grounds.

## ISSUES PRESENTED

1.      Whether DIRECTV failed to adequately plead Article III standing because it relied on a speculative chain of causation.

2.      Whether DIRECTV—an alleged priced-out buyer whose sole alleged injury is lost profits—failed to adequately plead antitrust injury.

3.      Whether DIRECTV—an alleged priced-out buyer whose sole alleged injury is lost profits—is an inefficient enforcer of the antitrust laws.

5

## STATEMENT OF THE CASE

### A.    The Market For Retransmission Of Television Broadcast Programming

Appellees Nexstar Media Group, Inc. ("Nexstar"), Mission Broadcasting, Inc. ("Mission"), and White Knight Broadcasting, Inc. ("White Knight") are broadcast station groups—companies that own broadcast television stations in various local markets, called "designated market area[s]." *See* Compl. ¶¶ 1, 5, 31–33, Dkt. No. 1 [JA___, ___, ___].  Broadcast station groups license the distribution of their stations to subscribers of multichannel video programming distributors ("MVPDs"), including cable or satellite providers like Appellant DIRECTV, LLC ("DIRECTV"), through specific contractual agreements known as retransmission consent agreements.  *See id.* ¶¶ 3, 38–39 [JA___].  Retransmission consent agreements (sometimes called "RCAs") generally give MVPDs the right to carry the full-time feed of a station in return for a negotiated fee and/or other consideration.  *Id.* ¶¶ 4, 60–61 [JA___, ___].

If retransmission-consent-agreement negotiations between an MVPD and the broadcaster are unsuccessful, the MVPD is not authorized to distribute the broadcaster's stations in the corresponding local markets, resulting in a "blackout" of those stations in those markets until a new agreement is reached.  *Id.* ¶¶ 2, 62 [JA___, ___].  Despite its dramatic name, a "blackout" simply reflects that the MVPD and the broadcaster did reach a meeting of the minds, and the MVPD did not

6

buy the retransmission seller's product. The stations' signals remain available to consumers over the air (for free) and through other MVPDs and online services. *See, e.g.*, *Am. Broad. Cos., Inc. v. Goodfriend*, 557 F. Supp. 3d 409, 411 (S.D.N.Y. 2021) (discussing aggregation of over-the-air, free broadcast signals, including as an alternative "in the event of a channel blackout").

Station blackouts on MVPDs are not uncommon although the scope and duration may vary widely depending on the MVPD and broadcaster group. Compl. ¶ 2 [JA___]; *see also*, *e.g.*, *In re Customer Rebates for Undelivered Video Programming During Blackouts*, Notice of Proposed Rulemaking, MB Docket No. 24-20, FCC 24-2, ¶ 3, n.5, & n.7 (rel. Jan. 17, 2024) (FCC noting the increase in number of blackouts for MVPDs, including DIRECTV). DIRECTV has a long and well-documented history of failed retransmission-consent-agreement negotiations that resulted in blackouts, presumably for legitimate business reasons that were not alleged to have been fueled by supposed antitrust conspiracies. *See, e.g.*, *id.*

## B. DIRECTV's Failed Retransmission Renewal Negotiations

In 2019, DIRECTV entered into three-year retransmission consent agreements with Mission and White Knight. Compl. ¶¶ 90, 95 [JA___, ___]. Prior to expiration, in 2022, DIRECTV opened renewal negotiations with Mission and White Knight, which it ultimately abandoned, allowing the agreements to expire. *Id.* ¶¶ 2, 91 [JA___, ___]. As a result, in October 2022, DIRECTV ceased carriage of

Mission's and White Knight's stations, and they were not available via DIRECTV to its subscribers. *Id.* ¶ 103–04, 114 [JA___, ___]. Separately, DIRECTV had a retransmission consent agreement with Nexstar that expired in 2023. *Id.* ¶ 18 [JA___].

### C. Procedural History

In March 2023—shortly before DIRECTV's agreement with Nexstar was set to expire—DIRECTV sued Nexstar, Mission, and White Knight, alleging they conspired to raise and fix retransmission-consent fees from DIRECTV in violation of the Sherman Act and common law. Compl. ¶¶ 1, 152–82, 214–26 [JA___, ___–___, ___–___]. DIRECTV sued under the Clayton Act, which provides a cause of action for private enforcement of the antitrust laws and allows damages (in Section 4) and injunctive relief (in Section 16). Counts One through Three of the complaint assert Sherman Act Section 1 antitrust claims for (1) per se price-fixing; (2) a price-fixing conspiracy under the rule of reason; and (3) unlawful information exchange. *Id.* ¶¶ 152–82 [JA___–___]. As to each, DIRECTV's only alleged injury is "higher prices being demanded of it and lost profits." *Id.* ¶¶ 158, 171, 182 [JA___, ___–___, ___]. The remaining counts assert state-law claims for breach of contract and tortious interference. *Id.* ¶¶ 183–225 [JA___–___]. Appellees moved to dismiss DIRECTV's antitrust claims for lack of Article III standing, lack of antitrust

standing, and failure to state a claim.  Def.'s Mem. of L. in Supp. of Mot. to Dismiss at 6–47, Dkt. No. 53 [JA___–___].

The district court granted Appellees' motion.  The court "agree[d]" with Appellees that "DIRECTV relies on a somewhat speculative chain of causation" because it guesses that "but for the collusive activity, the parties would have reached an agreement," and then "but for the blackout, customers would not have left DIRECTV."  D.Ct. 8 [JA___].  But the court found that DIRECTV had Article III standing because it believed that a plaintiff need only plead that its injury was "*possibly* fairly traceable," rather than "*plausibly* fairly traceable."  *Id.* [JA___].  Because DIRECTV alleged the parties possibly would have reached an agreement but for the alleged misconduct, the court found it sufficiently alleged traceability.  *Id.* at 8–9 [JA___–___].  For similar reasons, the court found redressability satisfied as well, though it assessed redressability only with respect to DIRECTV's damages claim and not with respect to its claim for injunctive relief.  *Id.* at 8 [JA___].

But the court concluded—for two independent reasons—that DIRECTV lacks antitrust standing.

*First*, the court concluded that DIRECTV failed to allege antitrust injury, *i.e.*, DIRECTV failed to plead that its alleged lost-profits injury flowed from that which makes Appellees' alleged acts unlawful.  *Id.* at 10 [JA___].  Instead, DIRECTV's alleged lost profits flowed from its own "unilateral decision to abandon

[retransmission] negotiations" and "exit the market." *Id.* at 11 [JA___]. And while lost profits may be recoverable by a company whose *competitors* fixed prices to exclude it from the market, DIRECTV alleged (1) that it was a priced-out buyer, not a competitor, and (2) that Appellees sought not to vanquish it from the market but to extract from it supracompetitive rates. *Id.* at 11–12 [JA___–___]. Thus, in light of DIRECTV's specific theory of injury and causation, and consistent with every controlling case, the court reasoned that DIRECTV "must show that it actually paid supracompetitive rates to establish antitrust injury." *Id.* [JA___–___].

*Second*, the court concluded that even if DIRECTV had pleaded antitrust injury, it would still lack antitrust standing because it is not an efficient enforcer. *Id.* at 13 [JA___]. To begin with, the court noted that buyers allegedly "priced out of the market" "typically" are inefficient enforcers because "their damages are both too indirect and speculative." *Id.* [JA___]. Quoting the "leading antitrust treatise," *Apple Inc. v. Pepper*, 587 U.S. 273, 283 (2019), the court noted that "[a]nyone could claim that he or she would have purchased at the competitive price but was priced out of the market as a result of the anticompetitive pricing." D.Ct. 13 (quoting IIA Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 391b1 (4th ed. 2014) ("Areeda & Hovenkamp")) [JA___]. The claims of "those who refused to purchase at the cartel price," therefore, "are *speculative*." *Id.* (quoting Areeda & Hovenkamp) [JA___].

10

Nothing in DIRECTV's complaint, the court continued, warrants a departure from that norm. DIRECTV's theory of causation, the court observed, relies on multiple layers of conjecture. *Id.* at 14 [JA___]. There is "no way of knowing" "whether, and on what terms, the parties would have agreed" absent the alleged price-fixing. *Id.* [JA___]. And there also is "no way of knowing" "whether because of such an agreement, subscribers would have stayed with DIRECTV." *Id.* [JA___]. In addition to resting on a speculative chain of causation, the court added, DIRECTV's "injury is indirect" because it "did not pay higher prices, but claims to have suffered by losing customers." *Id.* [JA___]. And the "uncertainty" of that alleged injury "stands in stark contrast to the MVDPs who actually paid Defendants." *Id.* at 15 (collecting cases) [JA___].

The district court dismissed Counts One through Three for lack of antitrust standing and declined to exercise supplemental jurisdiction over the remaining state-law claims. The district court did not reach the plausibility of the complaint's price-fixing allegations, which Appellees vigorously contest.

## SUMMARY OF ARGUMENT

DIRECTV has failed to plead Article III standing. But even if DIRECTV has somehow met the threshold for constitutional standing, DIRECTV has not met the higher standard of antitrust standing because it has not adequately pleaded (1) antitrust injury and (2) that it is an efficient enforcer of the federal antitrust laws.

I.      DIRECTV failed to adequately allege Article III traceability and redressability.  As the district court recognized (at 8), DIRECTV's theory of injury relies on a "speculative chain of causation" because it conjectures that (1) it was alleged price-fixing that allowed Mission and White Knight to propose high retransmission-consent fees; (2) but for this proposal, the parties would have successfully reached agreement on the terms of a complex retransmission agreement; and (3) had the parties reached agreement, fewer DIRECTV customers would have canceled subscriptions that DIRECTV already was losing for other reasons.  That chain is both speculative (in that it hypothesizes what would have happened in an alternate world) and attenuated (because the alleged injury does not flow directly from the alleged misconduct).  DIRECTV's claim for injunctive relief fails for the additional reasons that DIRECTV does not satisfy redressability nor plead a real and immediate threat of future injury.

II.     Even if DIRECTV has adequately pleaded constitutional standing, the district court's conclusion that DIRECTV did not adequately plead antitrust injury is correct and requires dismissal.  DIRECTV alleges that it is a priced-out buyer, not a competitor.  Ordinarily, a buyer that did not "buy at higher prices" lacks antitrust injury.  *Port Dock & Stone v. Oldcastle Ne.*, 507 F.3d 117, 124 (2d Cir. 2007); *see also* D.Ct. 10–12 (recognizing that nonpurchasers typically lack antitrust injury) [JA___–___].  Price-fixing aimed at buyers typically has only one objective: the

extraction of supracompetitive prices.  (By contrast, price-fixing aimed at competitors typically seeks the elimination of competition.)  A buyer who pays a supracompetitive overcharge suffers a direct and immediate harm, flowing directly from that which makes the conduct unlawful.  A buyer who does not pay has only speculative, attenuated injury.  The nonpurchaser must conjecture that a transaction would have been consummated in a competitive world, speculate the but-for price that it would have paid, and then make additional assumptions about what would have happened post-transaction.

DIRECTV does not deny that nonpurchasers typically lack antitrust injury and provides no reason to depart from that principle here.  To the contrary, as the district court recognized, DIRECTV relies on a particularly speculative and attenuated theory of causation to claim lost profits arising from its own decision to terminate negotiations.  Because any allegedly priced-out buyer in a supply chain could claim an identical injury, antitrust law requires that a plaintiff actually purchase from the alleged price-fixing conspiracy to demonstrate antitrust standing except in narrow, unique circumstances.  The unique circumstances, such as price-fixing aimed at a competitor, are not present here.  Indeed, the only unusual aspect about the allegations in this case is that DIRECTV does not even claim that Appellees benefitted from the alleged price-fixing scheme in any way.  For all of these reasons,

DIRECTV cannot show the requisite connection between the alleged misconduct and its alleged lost profits.

**III.** Even if DIRECTV has adequately alleged both Article III standing and antitrust injury, the case should still be dismissed because the district court correctly held that DIRECTV is an inefficient enforcer. While this Court has often affirmed dismissal when only one or two of the four efficient-enforcer factors support the defendant, here all four favor Appellees. *First*, because DIRECTV did not pay any supracompetitive price, its claims rely on an attenuated, multi-step causal chain. But a buyer has antitrust injury only when injured at the "first step" in the chain. *Second*, compared to DIRECTV, there are more direct alleged victims (*i.e.*, buyers who have paid the allegedly supracompetitive prices). DIRECTV emphasizes that the complaint does not identify any such buyers, but this Court has repeatedly made clear that the second factor concerns "potential" plaintiffs. *E.g.*, *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 67 (2d Cir. 2019). *Third*, DIRECTV's theory of damages—which would require multiple inquiries into what would have happened in an alternate world—is highly speculative. *Fourth*, DIRECTV's theory would create a high risk of duplicative recovery and complex apportionment of damages in many cases by enabling *any* buyer theoretically priced out by the alleged price-fixing to recover for their lost gains from trade.

14

## ARGUMENT

DIRECTV alleges that Appellees' price-fixing *failed* with respect to DIRECTV. Because DIRECTV "refused" Appellees' alleged price-fixing, Compl. ¶ 156 [JA___], it relies on a series of speculative steps in its attempt to plead injury. Article III standing and antitrust standing both bar lawsuits premised on a theory of causation so speculative and attenuated.

## I. DIRECTV LACKS ARTICLE III STANDING.

Article III standing is "necessary to [this Court's] jurisdiction," *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 41 n.12 (2d Cir. 2015), and is not present here. Article III standing requires injury in fact, traceability, and redressability. *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023). Here, traceability and redressability are fatally lacking, providing a threshold, alternative basis to affirm dismissal of DIRECTV's claims. *See Allco Fin. Ltd. v. Klee*, 805 F.3d 89, 91, 93 (2d Cir. 2015) (affirming dismissal on "alternative," jurisdictional grounds) ("We are entitled to affirm the judgment on any basis that is supported by the record." (cleaned up))

### A. DIRECTV Failed To Adequately Plead Traceability.

The district court fully grasped the complaint's deficiencies with respect to traceability, but ultimately found jurisdiction because it applied a mistakenly lenient legal standard. The court "agree[d] with [Appellees]" that DIRECTV relies on a "speculative chain of causation." D.Ct. 8 [JA___]. But citing a district-court

15

opinion, the court concluded that DIRECTV nevertheless satisfied Article III because it "need not allege that its injury is *plausibly* fairly traceable, but, rather, that the injury is *possibly* fairly traceable." *Id.* (cleaned up) [JA___].[1]

This Court has explained multiple times in the past three years that the applicable standard is plausibility, not possibility. A "plaintiff asserting standing must allege facts that *affirmatively and plausibly* suggest that it has standing to sue." *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021) (emphasis added) (internal quotations omitted); *see also Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 75 (2d Cir. 2022) (emphasis added); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) (plaintiff asserting standing cannot rely on causal "possibilities"). This Court thus rejects standing allegations that are "possible" but do "not rise to the level of being plausible." *Amidax Trading Grp. v. S.W.I.F.T SCRL*, 671 F.3d 140, 148 (2d Cir. 2011).

This reflects the longstanding rule that a plaintiff "must support each element of standing with the manner and degree of evidence required at the successive stages

---

[1]    The district court added (at 8–9) a *see also* citation to this Court's opinion in *Harry v. Total Gas & Power, Inc.,* for the proposition that "the pleading standard for constitutional standing is lower than the standard for a substantive cause of action." 889 F.3d 104, 110 (2d Cir. 2018). This case illustrates the proposition—DIRECTV must meet a higher bar for antitrust standing than for constitutional standing, *see infra*. *Harry* should not be overread to conflict with this Court's cases explaining that a plaintiff must meet the plausibility standard to establish constitutional standing.

of the litigation." *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) (internal quotations omitted). At the pleading stage, of course, that standard is plausibility. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Accordingly, and consistent with the standard applied on the merits, a plaintiff "bears the burden of establishing standing in the same way as any other matter on which it bears the burden of proof." *Amidax*, 671 F.3d at 145 (internal quotations omitted); *see also Conn. Parents Union*, 8 F.4th at 172 (noting that courts assessing standing at the pleading stage "need not credit a complaint's conclusory statements without reference to its factual content").

Under the correct legal standard, the district court's recognition that DIRECTV relies on a "speculative chain of causation," D.Ct. 8 [JA___], confirms the absence of Article III standing. As the district court recognized, Article III requires causation between a plaintiff's injury and a defendant's alleged conduct that "must not be too speculative or too attenuated." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024). Thus, Plaintiffs may not rely on "speculative links"—*i.e.*, traceability is not satisfied when it is "not sufficiently predictable how third parties would react to [the defendant's] action or cause downstream injury to plaintiffs." *Id.* Nor may plaintiffs rely on "attenuated links"—*i.e.*, traceability is not satisfied when "the [defendant's] action is … far removed from its distant (even if predictable) ripple effects." *Id.* And standing theories that "require guesswork as to

how independent decisionmakers will exercise their judgment" are generally insufficient. *See Murthy*, 144 S. Ct. at 1986. These requirements apply to allegations of both "future" and "past injuries." *Id.* at 1987; *see Warth v. Seldin*, 422 U.S. 490, 505 (1975) (explaining plaintiff must "establish that, in fact, the asserted injury was the consequence of the defendants' actions").

If a complaint's allegations of causation are "simply too speculative or too attenuated to support Article III standing," *All. for Hippocratic Med.*, 602 U.S. at 393, it must be dismissed for failure to allege traceability, *Amidax*, 671 F.3d at 148–49; *see also* Areeda & Hovenkamp § 335 ("[C]onstitutional and antitrust standing overlap, particularly in those cases where the plaintiff has not shown any injury caused by the antitrust violation."). That is precisely the case here. DIRECTV's harm allegations fail because they are both too speculative and too attenuated to confer standing.

### 1. DIRECTV Relies On A Speculative Chain Of Possibilities.

DIRECTV's traceability theory falters at the outset because it relies on a "speculative chain of possibilities." *Clapper*, 568 U.S. at 414. *First*, DIRECTV speculates that Appellees' alleged collusion allowed Mission and White Knight to demand high retransmission-consent fees. Compl. ¶¶ 156–57 [JA___–___]. *Second*, DIRECTV speculates that but for this demand for high retransmission-consent fees, the parties would have successfully reached agreement on all the terms

18

of renewed retransmission-consent agreements. *Id.* ¶¶ 156, 158 [JA___–___]. *Third*, DIRECTV speculates that the blackouts caused unidentified customers to "cancel[] their DIRECTV subscription" in greater numbers than had been canceling their subscriptions prior to the failed negotiations, resulting in lost profits. *Id.* ¶¶ 158, 190 [JA___, ___–___].

On the first causal link, DIRECTV does not plausibly allege that Mission and White Knight would not have offered the same prices absent collusion. Indeed, the complaint's allegations strongly suggest the opposite: DIRECTV alleges that, marketwide, retransmission-consent fees "have increased a staggering 5,770 percent" since 2006—with further "increases" projected to "continue." *Id.* ¶¶ 42, 64 [JA___–___, ___]. The complaint alleges that during renegotiations, broadcasters have significant leverage because they can "hold the MVPD's subscribers hostage" with the threat of blackouts. *Id.* ¶ 62 [JA___]. On these allegations, Mission and White Knight plainly had both "independent incentives" and means to demand higher prices as a matter of "their own [business] judgment"—like countless other broadcast groups have over the past two decades. *Murthy*, 144 S.Ct. at 1977. DIRECTV's contrary claim is, therefore, inherently speculative.

The second link in the chain, that the parties would have successfully reached agreement on the terms of a retransmission contract absent Mission's and White Knight's proposed prices, is also a guess. Retransmission-consent negotiations are

19

high-stakes, fast-moving, and complex. *See* Compl. ¶¶ 93–94, 116 [JA___, ___]. Because the agreements typically last for "years," *id.* ¶ 60 [JA___], both sides have strong incentive to strike the best deal possible. Sometimes both sides dig in, resulting in blackouts. *Id.* ¶ 62 [JA___]; *see also id.* ¶ 2 [JA___] (blackouts are well "known in the industry"); *In re Customer Rebates for Undelivered Video Programming During Blackouts*, Notice of Proposed Rulemaking, MB Docket No. 24-20, FCC 24-2, ¶ 3 (rel. Jan. 17, 2024) ("Over the past decade … the number of blackouts resulting from unsuccessful retransmission consent negotiations has increased dramatically."). DIRECTV's complaint offers nothing beyond speculation that a blackout "would not have occurred" absent Appellees' alleged collusion. Compl. ¶ 168 [JA___]. Because it is "just as plausible" that DIRECTV's negotiations would have reached an impasse with Mission and White Knight absent the alleged collusion, its allegations fall short. *See Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 43 (1976).

DIRECTV's third causal link, that the blackouts caused customers to cancel subscriptions in larger numbers than had been canceling previously, is speculative too. Across the board, this link rests on "the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). And, moreover, DIRECTV's allegation that a single customer threatened to cancel because of the blackouts does not plausibly support the assertion that multitudes of

subscribers cancelled (who would not have cancelled otherwise) because of the blackout. Compl. ¶ 190 [JA___]. Indeed, the complaint itself offers an independent reason for subscriber cancellations: DIRECTV has instituted "higher subscription prices for its video product." *Id.* ¶¶ 42, 62 [JA___–___, ___]; *see also* AT&T Inc., 2020 Form 10-K, at 35, 47 (Feb 25, 2021), tinyurl.com/4vy78ptr (DIRECTV's parent company acknowledging that its video business, primarily DIRECTV, lost 1.19 million subscribers in 2018, 3.4 million in 2019, and 2.99 million in 2020).[2] In short, it is entirely speculative that customers cancelled their subscriptions because of blackouts and not because of price hikes, competition from streaming services, or any of the other reasons that have driven millions of cancellations in recent years. Accordingly, DIRECTV lacks Article III standing.

## 2. DIRECTV Alleges Only Attenuated Causal Links.

Even if DIRECTV's allegations were not speculative (and they are), they still would be too attenuated to satisfy traceability. Causation in an ordinary price-fixing case is straightforward and direct: a plaintiff alleges that the defendants' price-fixing caused the plaintiff to "pay[] a higher price." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 765 (2d Cir. 2016). Here, on the other hand, causation is anything but direct. According to DIRECTV, Appellants price-fixed, that price-fixing made

---

[2] This Court can "consider … legally required public disclosure documents filed with the SEC" to decide a motion to dismiss. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

negotiations break down, the failed negotiations caused blackouts, the blackouts caused customers to cancel subscriptions, and DIRECTV lost profits. DIRECTV's theory thus transparently relies on the "ripple effects" of the alleged price-fixing. *All. for Hippocratic Med.*, 602 U.S. at 383. But even if remote ripple effects are "predictable," they "cannot establish Article III standing." *Id.*

Because all allegedly priced-out buyers could allege the same injury DIRECTV alleges here, there is "no principled way to cabin [its] sweeping" theory of traceability. *All. for Hippocratic Med.*, 602 U.S. at 392; *see also Rynasko v. NYU*, 63 F.4th 186, 195 (2d Cir. 2023) (no standing because economic loss from alleged conduct was attenuated); *infra* Section II. For this additional reason, Article III standing is lacking.

## B. DIRECTV's Request For Injunctive Relief Fails For Additional Reasons.

DIRECTV's request for injunctive relief fails for additional reasons—both because it failed to adequately plead redressability, and because it failed to allege a real and immediate threat of future injury.

### 1. DIRECTV Did Not Adequately Plead Redressability.

For similar reasons that DIRECTV cannot satisfy traceability, it cannot satisfy redressability. *See All. for Hippocratic Med.*, 602 U.S. at 380 (explaining that "causation and redressability … are often 'flip sides of the same coin'"). To accept DIRECTV's redressability theory, the Court must find that (i) an injunction would

grant DIRECTV a more favorable negotiating position, (ii) that more favorable position would end the blackouts, and (iii) ending the blackouts would prevent some customers from cancelling their subscriptions. For the same reasons this causal chain fails to satisfy traceability, it is too speculative and too attenuated on the redressability prong. *See Brown*, 600 U.S. at 561 ("it must be 'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision").

The district court never asked whether DIRECTV's request for injunctive relief is redressable. The court held only that DIRECTV "seeks lost profits," and that those profits would "provide Plaintiff 'some measure of relief.'" D.Ct. 8 [JA___]. But "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Here, DIRECTV seeks both lost profits, Compl. Prayer for Relief ¶ 2 [JA___], and injunctive relief, *id.* ¶ 1 [JA___], and DIRECTV must satisfy redressability for both.

## 2. DIRECTV Did Not Allege A Real And Immediate Threat Of Future Injury.

A plaintiff seeking injunctive relief "cannot rely on past injury to satisfy the injury requirement" but rather "must show a likelihood that he ... will be injured in the future." *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (plaintiff must allege "a sufficient likelihood that he will again be wronged in a similar way"); *O'Shea v. Littleton,* 414

U.S. 488, 495–96 (1974) ("past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief" "if unaccompanied by any continuing, present adverse effects" (cleaned up)). The threat of future injury must be "real and immediate." *Lyons*, 461 U.S. at 105. In other words, "threatened injury must be *certainly impending* to constitute injury in fact," and "allegations of *possible* future injury are not sufficient." *Calcano*, 36 F.4th at 74.

Here, that means DIRECTV must allege both that (1) it will immediately reenter negotiations with Mission and White Knight; and (2) Mission and White Knight will again attempt to fix prices. The complaint alleges neither.

*First*, the complaint does not allege that Mission and White Knight will immediately reenter negotiations with DIRECTV. To the contrary, the complaint alleges that from the expiration of the RCAs through the present, Mission and White Knight have "refused to negotiate" with DIRECTV. Compl. ¶¶ 118–119 [JA___]. The complaint alleges that Mission and White Knight "accuse[d] DIRECTV of lying" and "disparag[ed] DIRECTV in public statements." *Id.* ¶¶ 188, 200 [JA___, ___]. Mission and White Knight, according to the complaint, believe that DIRECTV "ma[de] negotiations very difficult." *Id.* [JA___, ___]. Taking the complaint's allegations as true, immediate negotiations between Mission or White Knight and DIRECTV are far from "certainly impending." *Calcano*, 36 F.4th at 74 (emphasis omitted).

24

This Court has held in previous cases that past transactions do not provide a basis for seeking injunctive relief. *E.g.*, *Berni v. Barilla S.p.A.*, 964 F.3d 141, 147 (2d Cir. 2020) ("past purchasers of a product … are not likely to encounter future harm of the kind that makes injunctive relief appropriate"); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016); *Kommer v. Bayer Consumer Health*, 710 F. App'x 43, 44 (2d Cir. 2018); *Calcano*, 36 F.4th at 76. The same is true for past negotiations that failed—and all the more so when, unlike in the cases just cited, both sides must agree to negotiate before a transaction can occur.

*Second*, the complaint does not allege that Mission and White Knight will attempt to fix prices even if negotiations immediately resume. To the contrary, the complaint alleges that Mission and White Knight fixed prices for a specific purpose that no longer exists. Specifically, the complaint asserts that Mission and White Knight fixed prices to "set a sufficiently high price floor" for negotiations with Nexstar. Compl. ¶ 19 [JA____]. The alleged date for such negotiations has come and gone, and DIRECTV and Nexstar have entered into a new retransmission consent agreement. *See* Letter from DIRECTV Counsel to Hon. Paul A. Crotty, Dkt. No. 72. The alleged motivation behind the alleged price-fixing thus has no future application.

DIRECTV has, "at most, alleged a past harm," which if true is "redressable at law through the award of damages, which, it should be noted, is what [DIRECTV]

25

primarily sought in [its] complaint." *Berni*, 964 F.3d at 147. Because DIRECTV does not allege a "likelihood of a future encounter" with Appellees, *Shain*, 356 F.3d at 215, and does not allege that the asserted misconduct will likely recur, *Dorce v. City of New York*, 2 F.4th 82, 96 (2d Cir. 2021), DIRECTV lacks Article III standing with respect to its injunctive-relief claim.

## II.    DIRECTV LACKS ANTITRUST STANDING.

Antitrust-standing doctrine imposes a distinct and higher bar than Article III. As the Supreme Court explained in its seminal antitrust-standing case, even when there is "[h]arm to the antitrust plaintiff" "sufficient to satisfy the constitutional standing requirement of injury in fact," the court still "must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Associated Gen. Contractors*, 459 U.S. at 535 n.31. This Court has similarly observed that for antitrust standing, it is "not enough" for the injury to be "causally linked to the asserted violation." *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 76 (2d Cir. 2013) (internal quotations omitted). Therefore, antitrust standing recognizes that some persons injured by anticompetitive conduct will not be permitted to sue. *See Associated Gen. Contractors*, 459 U.S. at 534, 543 (while "[a]n antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy," there must be "limits" on which injured persons may sue); *Gelboim*, 823 F.3d at 779 ("not every victim of an antitrust violation" will

be compensated); *see also Mid-W. Paper Prods. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 582 (3d Cir. 1979) (antitrust-standing doctrine "preserve[s] the effectiveness of the treble damage remedy without overextending its availability"); Areeda & Hovenkamp § 335 ("[A]lthough price fixing among manufacturers typically elevates prices to both their immediate customers and to downstream consumers, antitrust policy generally denies standing to the consumers even though they have constitutional standing.").[3]

To satisfy antitrust standing at the pleading stage, a plaintiff must plausibly allege that (1) it suffered a "special kind of antitrust injury" and (2) it is a "suitable plaintiff to pursue the alleged antitrust violations" and thus an "efficient enforcer of the antitrust laws." *IQ Dental Supply*, 924 F.3d at 62. The district court correctly found that DIRECTV meets neither requirement. If this Court concludes that it has

---

[3]     Antitrust standing is derived from the statutory text. The *Associated General Contractors* Court explained that Clayton Act Section 4 must be "construed in the light of its common-law background." 459 U.S. at 531. The common law "circumscribed the availability of damages recoveries" under theories such as "proximate cause," "directness of injury," and "certainty of damages." *Id.* at 532. When assessing damages, the law did not "go beyond the first step" of proximity. *Id.* at 534; *see also* Areeda & Hovenkamp § 335 ("The plaintiff seeking injunctive relief must generally meet all the requirements that apply to the damages plaintiff."); *Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86, 94 (2d Cir. 2019) (same). Antitrust-standing doctrine incorporates these common-law rules. *See Associated General Contractors*, 459 U.S. at 531–34; *see also Lexmark Int'l, Inc., v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (*Associated General Contractors* "'ascertain[ed],' as a matter of statutory interpretation, the 'scope of the private remedy created by' Congress in § 4 of the Clayton Act" (quoting *Associated General Contractors*)).

jurisdiction (and it should not), therefore, it should conclude that DIRECTV lacks antitrust standing as the district court did.

### A.  DIRECTV Has Failed To Plead Antitrust Injury.

Antitrust injury is injury that "flows from that which makes defendants' acts unlawful." *Atl. Richfield Co.*, 495 U.S. at 334 (cleaned up).  To assess antitrust injury, courts "compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges." *Harry.*, 889 F.3d at 115 (cleaned up).  That is, courts compare "the practice complained of and the reasons such a practice is or might be anticompetitive" with "the actual injury the plaintiff alleges," "looking to the ways in which the plaintiff claims it is in a worse position as a consequence of defendant's conduct." *Id* (cleaned up).

As a buyer, DIRECTV's alleged lost profits do not flow from that which makes the alleged agreement unlawful.  The district court therefore correctly held that, "[h]ere, Plaintiff's injury—lost profits resulting from the blackouts—does not flow from that which makes Defendants' acts unlawful because DIRECTV does not allege that it paid anticompetitive rates but instead made the unilateral decision to abandon RCA negotiations." D.Ct. 11 [JA___].  As the district court correctly explained, DIRECTV's losses instead "flow from its own choice to exit the market," and do not "result from Defendants' claimed unlawful acts, i.e., the extraction of supracompetitive prices." *Id*.

28

### 1. Nonpurchasers Typically Lack Antitrust Injury.

The district court correctly found below (and DIRECTV concedes) that DIRECTV "is not a competitor of the Defendants" and instead "is a buyer (i.e. a consumer) in the retransmission consent market." D.Ct. 12 (quoting DIRECTV district-court brief) [JA___]; *see also* Compl. ¶ 78 [JA___] (alleging the "relevant product market … is the market for retransmission consent of Big-4 stations"). As DIRECTV cannot and does not dispute, nonpurchasers—including allegedly priced-out buyers—ordinarily have not suffered an antitrust injury.

The "leading antitrust treatise," *Apple Inc.*, 587 U.S. at 283; *Gelboim*, 823 F.3d at 775 n.12, explains that nonpurchasers are "ignored," Areeda & Hovenkamp § 345. No doubt, price-fixing "injures nonpurchasers who would have purchased in the absence of the conspiracy." *Id.* But they are "ignored" because "as a practical matter, such would-be buyers cannot be satisfactorily identified." *Id.* (citing *Montreal Trading Ltd. v. Amaxn Inc.*, 661 F.2d 864, 864 (10th Cir. 1981)). "Anyone could claim that he or she would have purchased at the competitive price but was priced out of the market as a result of the anticompetitive pricing." *Id.* ¶ 391. Because there is no way to verify such claims, "courts are likely to find that the claims of those who refused to purchase at the cartel price are *speculative*." *Id.* (emphasis in original). Thus, "a consumer cannot obtain damages without showing

that she actually paid more or received less than she would have in the absence of the violation." *Id.* ¶ 345.

DIRECTV contends that this hornbook law does not apply because it is not merely a buyer but also a "distributor," but that directly contradicts the Department of Justice ("DOJ"), DIRECTV's own briefing below, and common sense. As pertains to antitrust standing, a distributor-buyer is situated no differently than any other buyer. As DOJ explains (at 8 n.5), as a "business that uses a product as an input to create another product or service," DIRECTV is a "*consumer* of that input for antitrust purposes" (emphasis added). Indeed, until DIRECTV decided that hornbook law forced it into the position that distributor-buyers are somehow different from other buyers, it recognized itself that "DIRECTV is a buyer (*i.e.*, a *consumer*) in the retransmission market." Pl.'s Mem. of L. in Opp. to Mot. to Dismiss at 14, Dkt. No. 60 (emphasis added) [JA___]; *see also* Compl. ¶ 78 ("The relevant product market in this case is the market for retransmission consent of Big-4 stations. In this market, broadcast station groups such as Nexstar are the 'sellers' and MVPDs are the 'buyers.'") [JA___]. While antitrust injury analysis may look different with respect to some classes of non-buyer plaintiffs like competitors, *see, e.g.*, *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677, 689 (2d Cir. 2009), DIRECTV can point to *no* case law that distinguishes between end-consumer buyers and distributor-buyers for purposes of establishing antitrust standing.

DIRECTV quotes (at 24) an Areeda & Hovenkamp paragraph saying that "'consumer' in the sense used here generally means the end-use purchaser," Areeda & Hovenkamp § 345, and that because it is "a distributor," the principles Areeda & Hovenkamp articulate do not apply. But that paragraph actually makes the opposite point: its purpose is to flag that consumer-buyers and distributor-buyers are no different for the antitrust-standing analysis. While "[n]ot all those who purchase from the antitrust defendant" are consumers in the end-user sense, such as "dealers purchasing for resale," "they too have standing to challenge illegal overcharges and other violations." *Id.* In other words, distributor-buyers are not treated differently just because they are not end-use purchasers. No less than other buyers, distributor-buyers have antitrust standing when they "purchase from the antitrust defendant." DIRECTV did not purchase from the antitrust defendant. DIRECTV provides no economic or legal rationale to treat distributor-buyers that are not in competition with defendants differently from any other buyers. All the principles Areeda & Hovenkamp articulate about priced-out buyers thus fully apply.

That is not to say *all* antitrust plaintiffs must always pay supracompetitive prices to satisfy antitrust standing. DIRECTV's misreading notwithstanding, neither Appellees nor the district court have advanced a bright-line rule of this kind. Indeed, the district court recognized that competitors may be able to satisfy antitrust injury in price-fixing cases through lost profits. D.Ct. 11–12 [JA___–___]. But that is

because buyers and competitors suffer distinct forms of antitrust harm. As the district correctly observed, and as DIRECTV's own authorities make clear, a competitor's lost profits flow directly from that which makes price-fixing as to competitors unlawful. *Id.* (citing *DNAML Pty, Ltd. v. Apple Inc.*, 25 F. Supp. 3d 422 (S.D.N.Y. 2014)); *see also DDAVP*, 585 F.3d at 689 ("[T]he defendants' competitors, unlike the plaintiffs, would be seeking lost profits, not overcharges. Lost profits are the difference between the competitive price and what the competitors' costs would have been, while overcharges are the difference between the defendants' supra-competitive price and the competitive price."). By contrast, decisions from this Court have consistently held that *buyers* typically must allege that they have paid a supracompetitive price.

In *Port Dock & Stone v. Oldcastle Northeast*, for example, this Court held that when a manufacturer (seller) refuses to deal with a distributor (buyer) upon achieving monopoly pricing power, the distributors "lack standing" under the antitrust-injury requirement. 507 F.3d at 123. That is "because their particular injury was not caused by an exercise of the defendant's newly acquired power to raise prices." *Id.* Rather, the distributor's harm stems from the "[supplier's] decision" not to deal, which is "something [the supplier] could have just as well done without having [raised prices]." *Id.*; *cf. Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[T]he Sherman Act does not restrict the

long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." (cleaned up)).  It is "the dealers or consumers who were forced to buy at higher prices (or inferior quality)" who have standing.  *Port Dock*, 507 F.3d at 123.  When "there is no overcharge issue regarding [certain distributors] because the distributors no longer deal in defendants' products," the "only potential down-stream victim of a monopoly overcharge would be [those] purchasing directly from the [defendants]."  *Id.* at 124 (cleaned up).

As a matter of legal logic and economic theory, *Port Dock*'s reasoning fully applies here.[4]  Like DIRECTV, the distributor (Port Dock) allegedly lost profits because the defendant "deprived [it]" of its "source of supply."  *Id.* at 119; *see also id.* at 123 ("Port Dock is a *former* customer.").  To whatever extent DIRECTV alleges that it was a specific target of price-fixing, that was certainly true in *Port*

---

[4]    DOJ observes (at 18) that *Port Dock* was a Section 2 monopoly case rather than a Section 1 price-fixing case, but that is a distinction without difference for purposes of the antitrust-standing analysis.  The typical antitrust injury that flows from an alleged monopolist or an alleged price-fixing conspiracy is the same: supracompetitive prices.  Because a group of price-fixers "determine[s] its profit-maximizing price just as a single-firm monopoly does," in a price-fixed market "price and output are equal to that of a monopolist."  Herbert Hovenkamp, Federal Antitrust Policy 185 n.1, 187 (6th ed. 2020); *see also Port Dock*, 507 F.3d at 123 ("the danger to customers from monopolization" is "the danger that the monopolist will raise prices and restrict output").  DOJ argues (at 18) that this Court "explicitly limited" its conclusions in *Port Dock* to the monopoly context, but DOJ does not quote *Port Dock* for that assertion and nowhere does the opinion contain any such limiting language.

33

*Dock*—the defendant "announced that it would no longer sell [its product] to Port Dock" specifically. *Id.* at 120. Port Dock lost everything it would have gained from competitively priced transactions—to the point it went bankrupt. *Id.* But that did not satisfy antitrust injury because Port Dock did not "buy at higher prices." *Id* at 124.

This Court has made similar pronouncements in price-fixing cases. In *Gatt*, for example, this Court held that the plaintiff's "lost revenue" resulting from alleged price-fixing was insufficient to confer antitrust injury because it did not pay supracompetitive prices. 711 F.3d at 77. *Gatt* involved a bid-rigging scheme, which is a "form of horizontal price fixing." *United States v. Aiyer*, 33 F.4th 97, 115 (2d Cir. 2022). The facts were different than those alleged here; the plaintiff was a competitor rather than a buyer. *See Gatt*, 711 F.3d at 77. But the Court's explanation of the antitrust injury created by price-fixing pertains fully. Price-fixing "is unlawful," the Court explained, "because of the harm it may cause—increased prices—to purchasers." *Id.* The remediable harm from price-fixing, the Court continued, is not the "lost revenue" that may result. *Id.* Rather, it is the "higher prices" purchasers must pay. *Id.* A buyer who did not "pay higher prices for a product" typically does not have antitrust injury. *Id.*[5]

---

[5] As with *Port Dock*, DOJ also attempts to minimize *Gatt* (at 17) by calling its discussion a "brief reference to harm from purchasers." But that is inaccurate. Far

At minimum, *Gatt* leaves no doubt that "overcharge … is the main focus of federal antitrust policy." Areeda & Hovenkamp 779 § 16.4c. *Gatt* is no anomaly in that respect—this Court has explained many times that a price-fixing claim ultimately requires a showing that the conduct "caused injury to the plaintiff in the form of artificially inflated prices." *McCarthy v. Bank of Am.*, No. 23-0619-CV, 2024 WL 2206794, at *2 (2d Cir. May 16, 2024); *see also, e.g.*, *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012). At least as a general rule, nonpurchasers lack antitrust injury.

DIRECTV's briefing only reinforces that conclusion. DIRECTV never denies that nonpurchasers ordinarily lack standing. Indeed, DIRECTV's own citation recognizes the presumption: "nonpurchasers priced out of a market face an especially high bar to demonstrate antitrust standing." *In re Pandora Media, LLC*, No. 2:22-cv-00809, 2022 WL 19299126, at *6 (C.D. Cal. Oct. 26, 2022).

### 2. DIRECTV's Allegations Do Not Meaningfully Distinguish It From Other Nonpurchasers.

This case presents no reason to depart from the general rule that nonpurchasers lack antitrust injury. When courts have found antitrust injuries other than payment of supracompetitive prices, it is generally because the defendant allegedly attempted

---

from making a stray or passing remark, the Court repeatedly emphasized the need for payment of supracompetitive prices in the central paragraph of its antitrust-injury analysis. DOJ also says (at 17) that the *Gatt* Court was naming only one illustrative form of recoverable injury, but *Gatt*'s language is not so limited.

to drive the plaintiff out of the market. *See, e.g.*, *DNAML Pty, Ltd. v. Apple Inc.*, 25 F. Supp. 3d 422 (S.D.N.Y. 2014). But here DIRECTV alleges that Appellees conspired to "raise prices and extract supracompetitive retransmission consent fees from DIRECTV." Compl. ¶ 9 [JA___]. The district court therefore correctly distinguished cases relied on by DIRECTV, explaining, "[u]nlike in *DNAML*, Defendants did not conspire to vanquish DIRECTV from the market so that they could sell directly to consumers at inflated prices; they allegedly conspired to extract supracompetitive prices from DIRECTV." D.Ct. 12 [JA___].[6]

The damages remedy DIRECTV seeks—lost profit—underscores this point. For the reasons explained above, that remedy could be sought by *every* allegedly priced-out buyer operating in a supply chain. Each one, after all, misses out on what it would have profited from a consummated transaction at the competitive price. *See, e.g., City of Oakland v. Oakland Raiders*, 20 F.4th 441, 458 (9th Cir. 2021) (no antitrust standing in *Montreal Trading* though plaintiff alleged that "as a result of the defendants' actions it was unable to buy potash that it could have resold at

---

[6]     DIRECTV proposes a categorical rule that a distributor buyer "has antitrust standing where it is forced to stop distributing the [seller's] products because it refuses to pay fixed prices and therefore loses profits." DIRECTV Br. 2. That proposition stands exactly opposite current law: under DIRECTV's theory, every time price-fixing prices a distributor-buyer out of the market, the distributor-buyer may sue for lost profits. And while DIRECTV might limit its rule to distributor-buyers, it suggests no logical reason for that limitation.

profit"). But that ordinary, ever-present harm "is not an injury that flows from that which makes [price-fixing] unlawful." *Gatt*, 711 F.3d at 77.

While lost profit is often an antitrust injury for competitors, *see DDAVP*, 585 F.3d at 689, a buyer cannot generally rely on lost profits because they do not flow from that which makes a price fixing agreement unlawful. DIRECTV's alleged injury stems from its own unilateral decision to abandon contract negotiations with White Knight and Mission. D.Ct. 11 [JA___].

Further, a buyer's supposed lost profits rely on speculation and counterfactuals. Here, for example, DIRECTV's theory involves a disjointed story of how it was injured based upon multiple layers of conjecture ending with its own unilateral decision to abandon contract negotiations with White Knight and Mission. For the reasons DIRECTV's multistep speculative chain of causation deprives it of Article III standing, *see supra* Section I, DIRECTV all the more so lacks antitrust injury, which is a more demanding standard, *see Associated Gen. Contractors*, 459 U.S. at 531, 534, 543.

DOJ focuses on the fact that price-fixing causes output reduction and other market harms beyond increased prices, but it only slays a strawman. DIRECTV has stated numerous times that its injury stems from lost profits alone. *See, e.g.*, Dkt. No. 72 ("DIRECTV's standing is based on lost profits arising from the blackout of stations owned by Defendants Mission Broadcasting and White Knight."). And

neither the district court nor Appellees have ever suggested that price-fixing harms the market only by raising prices, or that output-reduction is not a price-fixing harm. *See, e.g.*, D.Ct. 13 [JA___] ("In the ordinary horizontal price fixing case, sellers collude on price *and output* in an effort to maximize their profits." (emphasis added and internal quotation marks omitted)). Rather, supracompetitive pricing generally is the only harm to buyers that is direct and concrete enough to confer antitrust injury. *See, e.g.*, *Gatt*, 711 F.3d at 77.[7]

Here, for example, the complaint does not allege that any output reduction harmed *DIRECTV* beyond the fact—present for all allegedly priced-out buyers—that it lost its gains from trade. *See, e.g.*, *Montreal Trading*, 661 F.2d at 867 ("those who are unable to purchase due to product scarcity [*i.e.*, output reduction]" lack antitrust standing though they could have "resold [the product] at a profit"). DIRECTV alleges that it was further harmed in the *end-consumer* market one level down the supply chain. But "[p]arties whose injuries ... are experienced in another market" "do not suffer antitrust injury." *In re Aluminum Warehousing Antitrust*

---

[7]    Moreover, only private plaintiffs are limited by the Clayton Act's standing requirements to show "antitrust injury." Government enforcers, in contrast, can bring antitrust challenges against alleged price-fixing conspiracies on a broader range of potential competitive harms. DOJ's concerns expressed in its amicus brief both reflect a misreading of the district court's opinion below and further do not affect its own antitrust enforcement abilities.

*Litig.*, 833 F.3d 151, 158 (2d Cir. 2016). "Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained." *Id.*

### 3. DIRECTV's Citations Highlight The Weakness Of Its Position.

DIRECTV's few citations to this Court and the Supreme Court only highlight the weakness of its position. DIRECTV starts with *In re DDAVP Direct Purchaser Antitrust Litigation*, but that case strongly supports Appellees. As an initial matter, that case involved actual buyers, as this Court recounted: "In this case, the plaintiffs are purchasers of the defendants' product who allege being forced to pay supra-competitive prices." 585 F.3d at 688.

Most importantly, *DDAVP* shows why lost profit is sometimes a recoverable antitrust injury but not here. The defendants argued that their competitors would be more efficient enforcers than the plaintiffs (who sought overcharge damages). *See id.* This Court disagreed, explaining that buyers and competitors suffer distinct forms of harm. *See id.* at 689. The Court observed that "the defendants' *competitors, unlike the plaintiffs*, would be seeking lost profits, not overcharges." *Id.* (emphases added). "Lost profits," the Court explained, "are the difference between the competitive price and what the *competitors'* costs would have been." *Id.* (emphasis added). The Court definitely said that "lost profits and overcharges are distinct injuries." DIRECTV Br. 19. But the Court made clear that lost profits is a remedy for *competitors*, while the remedy for buyers is overcharge. *See also, e.g.*, *Andrx*

39

*Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 816 (D.C. Cir. 2001) (cited by DIRECTV) (recognizing lost-profit remedy for competitor plaintiff who was "excluded from the market"); Areeda & Hovenkamp § 348 (under monopoly prices "consumers … have a damage claim for the resulting overcharge," "[b]ut this injury does not duplicate that of the injured rival, who seeks lost profit and not any overcharge").

DIRECTV's next and last Second Circuit citation in its antitrust-injury section is *Gelboim v. Bank of America*, and that case does not help it either. *Gelboim* did not involve a nonpurchaser, as the first two words of the opinion make clear: "Appellants purchased." 823 F.3d 759, 764 (2d Cir. 2016). The Court held that the plaintiffs sustained antitrust injury because they alleged price-fixing that caused them to "pay prices that no longer reflect ordinary market conditions." *Id.* at 772; *see also id.* at 773 (a "person who has purchased directly from those who have fixed prices" has antitrust injury). Because DIRECTV did not make a purchase, *Gelboim* does not help it.

DIRECTV asserts (at 28) that any plaintiff "placed … in a worse position as a consequence of [price-fixing]" has antitrust standing under *Gelboim*, but that radical position would destroy antitrust standing. *Gelboim* itself refutes it: "not every victim of an antitrust violation," the Court explained, will be "compensated under the antitrust laws." *Id.* at 779; *see also Associated Gen. Contractors*, 459 at

40

534 (Congress "did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation").

Unable to marshal support from antitrust precedents, DIRECTV devotes an entire section of its brief to *Lexmark International v. Static Control Components*, 572 U.S. 118 (2014), but that was a Lanham Act trademark case that did not purport to modify controlling antitrust precedent in any way. *See, e.g.*, *Gelboim*, 823 F.3d at 779 (continuing to apply *Associated General Contractors* after *Lexmark*); *7 W. 57th St. Realty Co. v. Citigroup, Inc.*, 771 F. App'x 498, 501 (2d Cir. 2019) (same). To the contrary, while calling into question the concept of prudential standing, *Lexmark* noted that *Associated General Contractors* "rested on statutory, not 'prudential,' considerations." 572 U.S. at 126. That affirmation of *Associated General Contractors* is the full extent of *Lexmark*'s discussion of antitrust law.

DIRECTV attempts to fight *Associated General Contractors* by asserting that the dissent has the "better" view "of the law than the majority." DIRECTV Br. 32 n.5. But stare decisis forecloses DIRECTV's preference for the *Associated General Contractors* dissent. This Court is obligated to leave antitrust-standing doctrine where the Supreme Court put it.

Apart from a couple citations (at 25–26) for the uncontroversial proposition that price-fixing causes wide-ranging market harm, that is the full extent of DIRECTV's citation to binding precedent. After more than a century of private

41

antitrust enforcement, DIRECTV cannot cite a single precedential case finding antitrust injury for an allegedly priced-out buyer.

Instead, DIRECTV relies heavily (at 20–23) on *DNAML*, a district-court case that involved completely different allegations. In *DNAML*, the plaintiff alleged that the defendants fixed prices in order to destroy the plaintiff's market. 25 F. Supp. 3d 422. The plaintiff, an e-book retailer named DNAML, alleged that Apple and several book publishers fixed prices at the retail level. Contrary to DIRECTV's assertion (at 21–22), Apple competed with DNAML at the retail level. *DNAML*, 25 F. Supp. 3d at 425–26. And DNAML specifically alleged that the defendants fixed prices in consummated contracts with DNAML in order to eliminate the retail level of the supply chain. As the district court here put it, "the goal of the conspiracy in *DNAML* was to oust the [plaintiff] from the market." D.Ct. 12 [JA___].

The facts alleged here are completely different. DIRECTV does not allege that one of the defendants is a competitor or that Appellees intended to drive it from the market. *See id.* (DIRECTV has not alleged that Appellees conspired to "vanquish DIRECTV from the market so that they could sell directly to consumers at inflated prices"). DIRECTV seems to cite *DNAML* mainly for the proposition (at 21) that "*[a] claim for lost profits can constitute a cognizable antitrust injury in the appropriate case*" (emphasis added by DIRECTV) in the abstract, but neither the

district court nor the Appellees have contested that unremarkable proposition. *DNAML* has no bearing on this case.

### 4. Any Allegation That Appellees Targeted DIRECTV Does Not Confer Antitrust Injury.

Grasping for a way to overcome the general rule that nonpurchasers lack antitrust injury, DIRECTV asserts (*e.g.* at 3) that Appellees "targeted" DIRECTV. But it is immaterial whether DIRECTV was "targeted" because all the reasons nonpurchasers typically do not have antitrust injury still apply when the plaintiff alleges targeting. The alleged injury still "was not caused by an exercise of the defendant's newly acquired power to raise prices." *Port Dock*, 507 F.3d at 123. The alleged injury still stems from the "[supplier's] decision" not to deal, which is "something [the supplier] could have just as well done without having [raised prices]." *Id.* The "dealers or consumers who were forced to buy at higher prices" still are more directly injured. *Port Dock*, 507 F.3d at 124.

DIRECTV suggests that alleged targeting makes a nonpurchaser's injury more foreseeable, DIRECTV Br. 29–30, but "the fact that [the plaintiff's] injury 'may have been foreseeable, predictable, and even calculable' is not by itself sufficient to confer antitrust standing." *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 262 (2d Cir. 2023) (quoting *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 142 (2d Cir. 2021)). Not even specific intent can "overcome the requirement that there must be a direct injury" under the Clayton Act.

*Laborers Loc. 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 242 (2d Cir. 1999) (noting that a contrary argument "was specifically rejected in [*Associated General Contractors*]").

Any targeting allegation, moreover, demonstrates the implausibility of the price-fixing allegations and paints DIRECTV into a corner. If the complaint alleges that Appellees fixed prices only with respect to DIRECTV, that would make this the rare price-fixing lawsuit—the *only* one, as far as Appellees are aware—alleging that the price-fixing conspiracy failed completely. And, according to DIRECTV, this failure was entirely foreseeable by Appellees. But there is no explanation why Appellees would have engaged in such a futile exercise or what Appellees gained as a result. When alleged anticompetitive behavior "in no way enriched the defendants," there is a "disconnect between the plaintiff's injury and the defendants' alleged [misconduct]" that indicates an "attenuated … causal chain" insufficient for antitrust injury. *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th at 260.

## B.  DIRECTV Has Failed to Plead That It Is An Efficient Enforcer Of The Antitrust Laws.

The district court also correctly held that even if DIRECTV had antitrust injury, dismissal still would be required because DIRECTV is not an efficient enforcer. D.Ct. 13 ("Even were the Court to conclude that DIRECTV had demonstrated antitrust injury, it is not an 'efficient enforcer' of the antitrust laws and therefore lacks statutory standing on that basis as well.") [JA___]. Antitrust-

standing doctrine is premised on the notion that "not every victim of an antitrust violation needs to be compensated ... in order for the antitrust laws to be efficiently enforced." *Gelboim*, 823 F.3d at 779. To that end, Supreme Court precedent prescribes four factors to be evaluated in determining whether a plaintiff is a "'proper party'" to enforce the antitrust laws, beyond the presence of antitrust injury:

(1) the "indirectness of the asserted injury" and the "chain of causation";

(2) whether "more direct victims" exist;

(3) whether damages are "'highly speculative'"; and

(4) the need to avoid "the risk of duplicate recoveries" or "complex apportionment of damages."

*Id*. at 778 (quoting *Associated Gen. Contractors*, 459 U.S. at 540–45).

Here, the district court correctly weighed these factors and determined that "DIRECTV's injuries are too indirect and speculative to confer antitrust standing." D.Ct. 13–15 ("There is no way of knowing whether, and on what terms, the parties would have agreed, and whether because of such an agreement, subscribers would have stayed with DIRECTV. Further, [DIRECTV]'s injury is indirect … .") [JA___].

DIRECTV quibbles with how the court explained its conclusion, saying (at 34) that reversal is warranted because "all four factors must be considered" and the district court "considered [only] two," but that is wrong in at least three ways. As

45

an initial matter, the district court clearly analyzed three of the four factors, not two. *See* DIRECTV Br. 35 (acknowledging that the district court analyzed factors one and three); D.Ct. 15 [JA___] (noting that "the MVDPs who actually paid Defendants" are more direct victims and citing *DDAVP*'s discussion of "[t]he second factor," 585 F.3d at 689); *id.* (DIRECTV is not an efficient enforcer "due to the indirectness of injuries, *the existence of more direct victims*, and the speculative nature of its harm" (emphasis added)).

Second, as the district court recognized, the four factors "need not be given equal weight: the relative significance of each factor will depend on the circumstances of the particular case." D.Ct. 13 (quoting *IQ Dental*, 924 F.3d at 65) [JA___]. For that reason, this Court has frequently held that the efficient-enforcer requirement was unsatisfied even though only *one or two* of the four factors supported the defendant. *See, e.g.*, *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th at 261–63; *In re Am. Express*, 19 F.4th at 143; *Daniel v. Am. Bd. Of Emergency Med.*, 428 F.3d 408, 443–44 (2d Cir. 2005). Indeed, this Court has often found one or both of the first two factors dispositive regardless of how the last two factors look. *See, e.g.*, *In re Platinum & Palladium*, 61 F.4th at 263 (plaintiff's inability to satisfy first factor was "decisive"); *Daniel*, 428 F.3d at 443–44 (more-direct-victims factor alone precluded standing). In *Daniel*, accordingly, this Court analyzed only one

46

factor before concluding that the plaintiffs lacked antitrust standing. 428 F.3d at 443–44. The district court can hardly be faulted for analyzing three.

Third, and most fundamentally, even if the district court had considered too few factors, that would not be ground for reversal because "federal appellate courts … do[] not review lower courts' opinions, but their judgments." *Jennings v. Stephens*, 574 U.S. 271, 277 (2015); *see also, e.g.*, *ACLU v. DOJ*, 894 F.3d 490, 494 (2d Cir. 2018) (appellate courts "review[] judgments, not statements in opinions"). This Court is always free to affirm "on any ground which finds support in the record, regardless of the ground upon which the trial court relied." *Gatt*, 711 F.3d at 75.[8]

While this Court has frequently ruled against a plaintiff on the basis of one or two efficient-enforcer factors, here all four factors favor Appellees.

### 1.    DIRECTV's Alleged Injury Is Too Indirect.

The first *Associated General Contractors* factor asks "whether the violation was a direct or remote cause of the injury," which requires "evaluation of the chain of causation" between the plaintiff's alleged injury and the defendant's alleged misconduct. *Gelboim*, 823 F.3d at 772, 778 (internal quotations omitted). The

---

[8]    DOJ's remand request is misconceived for the same reason. After misreading parts of the district court's opinion, DOJ asks this Court (at 23) to remand for the district court to redo its analysis. Putting aside DOJ's misunderstanding, addressed previously, concerns with a few sentences read out of context are not grounds for reversing an entire opinion. *See, e.g.*, *Davis v. New York City Dep't of Educ.*, 804 F.3d 231, 236 (2d Cir. 2015) ("Despite this error in the district court's reasoning, we nevertheless affirm the judgment.").

47

directness inquiry incorporates "familiar principles of proximate causation." *7 W. 57th St. Realty Co.*, 771 F. App'x at 502; *see also Gatt*, 711 F.3d at 78 ("Directness in the antitrust context means close in the chain of causation."). It is, therefore, "not enough" that a plaintiff "suffered a loss in some manner that might conceivably be traced to the conduct of the defendants." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 116 (2d Cir. 2021).

In the directness inquiry, "proximate cause is demarcated by the first step rule," which "limits liability to parties injured at the first step of the causal chain of the defendants' actions." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 135 (2d Cir. 2021) (cleaned up). This Court "has repeatedly followed the first-step rule in the antitrust context." *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th at 259; *see also Associated Gen. Contractors*, 459 U.S. at 534 (damages inquiry does not "go beyond the first step"). In *American Express*, for example, this Court held that the plaintiffs could not sue despite alleging that the defendant's conduct was a "cause of [their] injuries" because they did not purchase the defendant's product and therefore were not injured at the first step. 19 F.4th at 139–141.

DIRECTV does not allege that it was injured at the first step in the causal chain. *See* D.Ct. 13 (DIRECTV relies on a "chain" of causation) [JA___]; *supra* Section I (DIRECTV's theory of harm is so attenuated that DIRECTV lacks even

48

Article III standing). As the Ninth Circuit recently observed, "[a]lthough buyers who pay collusive overcharges (direct purchasers) ordinarily have antitrust standing to challenge a horizontal price-fixing scheme, buyers … who are priced out [of] the market—and hence do not purchase the product or pay the overcharge—ordinarily do not." *Oakland Raiders*, 20 F.4th at 448–49. That is because even factually priced-out buyers allege injuries "less direct than those of actual purchasers" who "agree[d] to supracompetitive prices." *Id* at 459. The Tenth Circuit agrees: because price-fixing is "aimed at" those who "purchase the product at the inflated price," the purchasers' injury is not only "more direct" but also "more proximately caused" than buyers who "are unable to purchase." *Montreal Trading*, 661 F.2d at 867–68.

The district court's conclusion that DIRECTV's alleged injury is "indirect," D.Ct. 14 [JA___], is therefore correct. And if a plaintiff does not allege the "required" "direct connection between the harm and the alleged antitrust violation," *American Express*, 19 F.4th at 143, the first factor is "decisive," *In re Platinum & Palladium Antitrust Litigation*, 61 F.4th at 263. Under the law of this Circuit, DIRECTV is not an efficient enforcer.

## 2. Under DIRECTV's Theory, More Direct Plaintiffs Would Exist.

Under the second efficient-enforcer factor, courts ask whether there is an "identifiable class" whose "self-interest would normally motivate them to vindicate the public interest in antitrust enforcement." *Gatt*, 711 F.3d at 78–79 (quoting

*Associated Gen. Contractors*, 459 U.S. at 542 (ellipses omitted)). As the district court recognized, the second factor also weighs against DIRECTV because—to the extent there was any actual illegal price-fixing conspiracy (which there was not)—there is an identifiable class that would be more directly injured than DIRECTV by the alleged conspiracy. Specifically, MVPDs that actually paid Appellees' purportedly supracompetitive prices would be more "efficient enforcers" to bring this antitrust claim.

Because the complaint alleges that DIRECTV did not purchase Appellees' products, DIRECTV belongs to a class of indirect enforcers who raise "the very concern of damages disproportionate to wrongdoing" that antitrust-standing doctrine guards against. *Gelboim*, 823 F.3d at 779. Courts consistently deny antitrust standing to nonpurchasers because "defendants secured no illegal benefit at [such plaintiffs'] expense," and permitting recovery "could subject antitrust violators to potentially ruinous liabilities, well in excess of their illegally-earned profits." *Mid-W. Paper Prods.*, 596 F.2d at 583, 586. Instead, "the most efficient enforcers" are those "most directly affected by a rise in prices or reduction in output." *Fisher v. Aurora Health Care, Inc.*, 558 F. App'x 653, 655 (7th Cir. 2014).

DIRECTV never denies that paying MVPDs would be more efficient enforcers. Instead, DIRECTV observes that the complaint does not identify any MVPD that purchased Appellees' products. But the Complaint alleges that

50

"DIRECTV has not been the only MVPD victimized by Defendants' conspiracy." Compl. ¶ 120 [JA___–___]. And more fundamentally, more efficient enforcers need not be explicitly referenced in a plaintiff's complaint; otherwise, a plaintiff could creatively plead its way into antitrust standing by declining to mention them.

The efficient-enforcer inquiry, rather, compares the plaintiff's enforcement interest with that of "other *potential* plaintiffs." *DDAVP*, 585 F.3d at 689 (emphasis added). The "existence of other plaintiffs," "whether in theory or in actuality," "indicates that the would-be antitrust plaintiff might not be well positioned to vindicate the antitrust laws." *IQ Dental*, 924 F.3d at 67; *see also id.* (fact that other plaintiffs' claims were foreclosed by statute of limitations had no bearing on most-direct-victim inquiry). The question, in other words is whether there *theoretically* is a "class" of persons in the world who are more efficient enforcers. *Gatt*, 711 F.3d at 79 (quoting *Associated Gen. Contractors*, 459 U.S. at 542); *see also, e.g.*, *7 W. 57th St*, 771 F. App'x at 502 (more direct victims existed though they were not specifically identified in complaint); *Daniel*, 428 F.3d at 443 (same). Here, the MVPDs that purchased Appellees' products are such a class.

Indeed, for DIRECTV's price-fixing allegation to be remotely plausible, there must be some MVPDs that purchased Appellees' products. Price fixing is "aimed at" those who "purchase the product at the inflated price." *Montreal Trading*, 661 F.2d at 868. A price-fixing seller makes no money, after all, off a buyer who does

51

not buy the product. Like monopolists, price-fixers set price based on demand—
they do not set price at a point where all buyers are priced out. *See Advo, Inc. v.
Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1203 (3d Cir. 1995) ("The shape of
the demand curve constrains the behavior of all sellers, even monopolists.").
DIRECTV must allege either that some MVPDs paid supracompetitive prices
(making them more efficient enforcers), or that Appellees set prices at a point where
zero MVPDs bought their product, an allegation that is both implausible and barred
by *In re Platinum*'s rule that antitrust plaintiffs cannot sue to allege a zero-profit
scheme. *See* 61 F.4th at 260.

While DIRECTV's complaint does not allege that other MVPDs have filed
suit, "[t]hat no [plaintiff] has brought suit to date 'does not support recognizing …
standing.'" *Gatt*, 711 F.3d at 79 (quoting *Daniel*, 428 F.3d at 444). To the contrary,
it may suggest, "perhaps, that the facts were other than as alleged by plaintiff." *Id.*;
*see also Associated Gen. Contractors*, 459 U.S. at 542 n.47, ("[I]f there is substance
to [the plaintiff's] claim, it is difficult to understand why the[] direct victims of the
conspiracy have not asserted any claim in their own right."); Phillip E. Areeda &
Herbert Hovenkamp, *Fundamentals of Antitrust Law,* § 3.01c, at 3–9 to 3–10 (4th
ed. 2011) ("If the 'superior' plaintiff has not sued, one may doubt the existence of
any antitrust violation at all.").

The existence of a more efficient class of plaintiffs alone means DIRECTV is not an efficient enforcer and its suit must be dismissed. *See Daniel*, 428 F.3d at 443–44 (plaintiffs were not efficient enforcers based on analysis only of the more-direct-victims factor).

### 3.    DIRECTV's Damages Are Highly Speculative.

As discussed, DIRECTV's damages are "highly speculative," a "sign that [it] is an inefficient engine of enforcement." *Gelboim*, 823 F.3d at 779; *see supra* Section I.A.1.  In general, "[a] nonpurchaser's injury is … highly speculative" because "we cannot know" what would have happened absent the alleged price-fixing.  *Oakland Raiders*, 20 F.4th at 449.  Because of the "speculative nature of the harm," courts "require a reasonable level of certainty" before concluding that "[n]onpurchasers who are priced out of the market" have antitrust standing.  *Id.* at 460.

As the district court explained, DIRECTV's "theory is speculative because it relies on two critical assumptions: that absent Defendants' collusive demands the parties would have reached an agreement, and that had the parties agreed, subscribers would not have left DIRECTV."  D.Ct. 14 [JA___].  Indeed, DIRECTV's damages "would be exceedingly difficult to calculate."  *Oakland Raiders*, 20 F.4th at 449.  There is no way to know whether and on what terms the parties would have agreed to a retransmission consent agreement or what lost subscribers can be attributed to the failed retransmission consent agreement

negotiations. *See Montreal Trading*, 661 F.2d at 868 ("[W]e will remain unsure about many things, including: whether the purchase would have been made from one of the conspirators or from one of their competitors; what quantity would have been purchased; what price would have been paid; and at what price resale would have occurred."). As mentioned, DIRECTV has a long history of failed retransmission consent agreement negotiations, resulting in blackouts having nothing to with alleged antitrust conspiracies. *See*, *e.g.*, *In re Customer Rebates for Undelivered Video Programming During Blackouts*, Notice of Proposed Rulemaking, MB Docket No. 24-20, FCC 24-2, ¶ 3, n.2, & n.7 (rel. Jan. 17, 2024) (FCC noting the increase in number of blackouts for MVPDs, including DIRECTV). And DIRECTV has been losing millions of subscribers since before the alleged price fixing. *See, e.g.*, AT&T Inc., 2020 Form 10-K, at 35, 47 (Feb 25, 2021), tinyurl.com/4vy78ptr (DIRECTV's parent company acknowledging that its video business, primarily DIRECTV, lost 1.19 million subscribers in 2018, 3.4 million in 2019, and 2.99 million in 2020). Even assuming the causal inferences DIRECTV proposes, there is no way to guess what a supposedly competitive rate would have been, or to disaggregate how many customers cancelled subscriptions for individualized other reasons.

DIRECTV asserts (at 38) that "[n]o … speculation is required here" because "the parties had a longstanding history of reaching agreements every three years,"

but that assertion fails. As an initial matter, it is not pleaded. DIRECTV cites (at 39) only paragraph 126 of the complaint for this assertion, and paragraph 126 says only that "DIRECTV has negotiated numerous retransmission consent agreements with both Mission and White Knight." [JA___]. That conclusory assertion is not nearly enough to allege a prior course of dealing. Given the "potentially massive factual controversy" and "unusually high cost of discovery" associated with antitrust suits, courts "insist upon some specificity in pleading" antitrust claims especially. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). "[C]onclusory statements" like DIRECTV's "do not suffice" and are "not entitled to be assumed true." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009). DIRECTV asserts the existence of prior contracts (if "negotiated" is read to mean "executed") but says nothing about when those contracts were entered or what they said. And its allegation does not even sufficiently plead that any contracts existed—a plaintiff "fails to sufficiently plead the existence of a contract" when it does not provide "factual allegations regarding, inter alia, the formation of the contract, the date it took place, and the contract's major terms." *Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., LLC*, 455 F. App'x 102, 104 (2d Cir. 2012).

More fundamentally, DIRECTV would not be saved by any allegation of past dealing. DIRECTV cites no case of this Court or any other circuit holding that a plaintiff was an efficient enforcer on the basis of a prior course of dealing. And past

dealing—particularly in a market that is dynamic—changes little about the efficient-enforcer analysis.  A nonpurchaser's injury still is indirect.  Paying buyers are still more direct victims.  The risk of duplicative recovery is still high.  And absent a steady stream of transactions in a static market, the injury still is speculative.

A central reason nonpurchasers typically lack antitrust standing is that "[a]nyone could claim that he or she would have purchased at the competitive price but was priced out of the market as a result of the anticompetitive pricing."  D.Ct. 13 [JA___] (quoting Areeda & Hovenkamp § 391b1).  The buyer knows its willingness to pay, but absent an actual transaction, its say-so is unverifiable.  And that remains true when there is a prior course of dealing in a dynamic market.  Maybe the buyer was willing to pay up to $10 last year, but that does not mean its willingness to pay is $10 this year.

The cases DIRECTV cites recognize this concern.  In *Oakland Raiders*, the Ninth Circuit emphasized that even if past dealings matter, the past dealings alleged "[did] not establish a *regular* course of dealing."  20 F.4th at 460.  The parties—the City of Oakland and the Oakland Raiders football team—had a "long course of dealing," *id.* at 465 n.1 (Bumatay, J., concurring), but this alone was insufficient.  Absent "*regular*" dealings in a static market, any harm would be entirely speculative.  *See id.* at 460 (majority).

Unable to invoke authoritative precedent, DIRECTV leans heavily on two out-of-circuit district-court cases. DIRECTV Br. 40–42 (citing *Flannery Associates LLC v. Barnes Family Ranch Associates, LLC*, No. 2:23-cv-00927-TLN-AC, 2024 WL 1344663, at *6–8 (E.D. Cal. Mar. 29, 2024); *In re Pandora Media, LLC*, No. 22-cv-00809-MCS-MAR, 2022 WL 19299126, at *7 (C.D. Cal. Oct. 26, 2022)). Those cases are nonprecedential and distinguishable. In *Pandora*—which is unpublished—there was an established baseline price across a substantial track record of prior transactions. *See* 2022 WL 19299126, at *5 (finding antitrust injury where the plaintiff alleged the defendant charged a price that "exceeds the status quo rate"). The complaint does not allege any status quo rate—indeed, by alleging marketwide increasing rates and volatile negotiations, the complaint indicates that there is not one. And in *Flannery*, there was a single buyer trying to purchase the entire market in the relevant geographic area where the single buyer had a history of making purchases. *See* 2024 WL 1344663, at *1–2. DIRECTV alleges nothing like that here.

Here, DIRECTV alleges a dynamic market with rapidly shifting supply and demand that is tied to other levels of a dynamic supply chain. DIRECTV alleges that the cost of retransmission has been increasing dramatically for decades. *See* Compl. ¶ 42 [JA___–___]. DIRECTV further alleges that end-consumer demand for subscription television packages—which directly affects DIRECTV's demand

57

for retransmission—has decreased dramatically at the same time. *See id.* ¶¶ 43, 64, 190, 203 [JA___, ___, ___–___, ___]. DIRECTV also alleges that retransmission consent is renegotiated only every three or four years. *See id.* ¶ 60 [JA___]. In a market where demand fluctuates dramatically and parties deal with one another at most every few years, and where there is nothing remotely resembling a "status quo rate," there is no way of verifying a particular buyer's purported willingness to pay. That is why antitrust-standing doctrine typically bars nonpurchasers from suit.

### 4. There Is Substantial Risk Of Duplicative Recoveries Or Complex Apportionment.

Because the efficient-enforcer factors "need not be given equal weight," and the district court correctly found that the remaining factors are fatally lacking, DIRECTV is not an efficient enforcer. *See* D.Ct. 13 (quoting *IQ Dental Supply*, 924 F.3d at 65) [JA___]. But the fourth factor also weighs against DIRECTV.

DIRECTV's claims raise a significant "risk of duplicate recoveries" and "the danger of complex apportionment of damages." *Associated Gen. Contractors*, 459 U.S. at 544. The injury DIRECTV alleges is the same injury every allegedly priced-out buyer in a supply chain could allege. And, if it were viable, there would be no logical reason to limit DIRECTV's theory to the retransmission market. If these "floodgates were opened," "the lure of a treble recovery would result in an overkill, due to an enlargement of the private weapon to a caliber far exceeding that contemplated by Congress." *Mid-W. Paper Prods.*, 596 F.2d at 587 (cleaned up);

*see also Gelboim*, 823 F.3d at 779 (citing *Mid-West Paper* for the "concern of damages disproportionate to wrongdoing").

## CONCLUSION

This Court should affirm the judgment below because DIRECTV lacks both constitutional and antitrust standing.

August 27, 2024

Respectfully submitted,

/s/ Lauren Willard Zehmer

/s/ Stephen J. Obermeier

Lauren Willard Zehmer
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
Tel: (202) 662-6000
lzehmer@cov.com

Stephen J. Obermeier
Frank Scaduto
Enbar Toledano
Michael J. Showalter
WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
Tel: (202) 719-7000
sobermeier@wiley.law
fscaduto@wiley.law
etoledano@wiley.law

David W. Haller
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018-1405
Tel: (212) 841-1000
dhaller@cov.com

*Attorneys for Mission Broadcasting, Inc.*

/s/ Kan M. Nawaday

Chris Schwegmann
LYNN PINKER HURST &
SCHWEGMANN LLP
2100 Ross Avenue Suite 2700
Dallas, Texas 75201
Tel: (214) 981-3835
cjs@lynnllp.com

Kan M. Nawaday
VENABLE LLP
151 West 42nd Street, 49th Floor
New York, NY 10036
Tel: (212) 307-5500
KMNawaday@Venable.com

*Attorneys for Nexstar Media Group, Inc.*

Craig A. Gilley
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, D.C. 20001
Tel: (202) 344-4000
CAGilley@Venable.com

Elizabeth C. Rinehart
VENABLE LLP
750 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
Tel: (410) 528-4646
ECRinehart@Venable.com

*Attorneys for White Knight Broadcasting, Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure 32 and Circuit Rule 32.1(a)(4) because it contains 13,971 words and has been prepared in a proportionally spaced typeface using Times New Roman, 14-point font.

/s/ Stephen J. Obermeier
Stephen J. Obermeier

## CERTIFICATE OF SERVICE

I certify that on August 27, 2024, I caused the foregoing to be served upon all counsel of record via the Clerk of Court's CM/ECF notification system.

/s/ Stephen J. Obermeier
Stephen J. Obermeier